# United States Court of Appeals

## For the First Circuit

No. 04-2447

UNITED STATES OF AMERICA,

Appellee,

v.

JAMES O'BRIEN,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Nathaniel M. Gorton, U.S. District Judge]

Before

Boudin, Chief Judge,

Stahl, Senior Circuit Judge,

and Lynch, Circuit Judge.

Dana A. Curhan with whom Brad Bennion was on brief for appellant.
Virginia M. Vander Jagt, Assistant United States Attorney, with whom Michael J. Sullivan, United States Attorney, was on brief for appellee.

January 18, 2006

**BOUDIN, <u>Chief Judge</u>**.  James O'Brien, who is appealing his conviction and sentence, is a computer consultant.  From 1997 until 1999, O'Brien was employed by Mill-Run Tours, a travel wholesaler that sells airline tickets to travel agents using a secure website and an airline reservation system--familiar to O'Brien--called Amadeus.  In July 1999, O'Brien, then living in Massachusetts, was fired from Mill-Run for making unauthorized changes to the Amadeus system.

During the third week of December 2000, several airline reservations that had been made through Mill-Run Tours were inexplicably cancelled, causing hardship to customers and loss to the firm.  Mill-Run traced these cancellations to an IP (internet protocol) address for a computer later determined to be O'Brien's.  Two specific logins to Amadeus by the user of that unique IP address occurred on December 18, 2000; once at 7:47 a.m. (when the bulk of the cancellations occurred) and again at 5:37 p.m.

The FBI executed a search warrant at O'Brien's Worcester, Massachusetts home on January 19, 2001, and seized his computer. He was interviewed when the seizure occurred but did not admit to wrongdoing and was not arrested at the time.  Later, after an investigation, O'Brien was indicted in April 2003 for intentionally causing damage to a computer used in interstate commerce.  18 U.S.C. § 1030(a)(5)(A)(i) (2000).

At trial, the parties stipulated that the cancellations had been made through O'Brien's computer, and the government presented evidence from which the jury could have concluded that O'Brien had left the company on bad terms; that at 7:43 a.m. on December 18, 2000, a few minutes before most of the cancellations had occurred, O'Brien had himself sent a message from his computer; and that he had initially told the FBI agent during the search that he had been in New York on December 18th--a claim readily disproved by other evidence.

O'Brien testified in his own defense, saying that he had left home immediately after 7:43 a.m. to meet a professor, one Joshua Aisiku, at 8 a.m.; that he had remained away all day; and that perhaps his now deceased brother had accidentally erased the reservations--O'Brien said that his brother had access to the computer and was interested in Amadeus. Aisiku also testified, but said that he was relying on O'Brien as to the time of the meeting and that he (Aisiku) usually did not arrive at work until 8:30 a.m.

During cross-examination of O'Brien, the prosecutor asked whether, when O'Brien had been interviewed at the search scene by the FBI, he had mentioned the possibility that his brother was responsible. O'Brien said no. The prosecutor then asked, "[Y]ou never told the U.S. Attorney's Office, isn't that correct, that your brother was the person responsible for this activity?" Defense counsel then objected that O'Brien was under no obligation

to speak to the FBI; the objection was overruled and the question was then repeated.

O'Brien then answered, testifying that the FBI had said during the interview that it would be back in touch but had never returned or contacted him again. When the prosecutor asked whether after his indictment in April 2003 O'Brien had contacted the U.S. Attorney's office and said that his brother was responsible, O'Brien answered, "I leave those things to my attorney." In closing, the prosecutor several times referred to O'Brien's failure to mention the brother to the government prior to his court testimony.

The jury convicted O'Brien. At sentencing, the judge calculated the guideline range for the offense at 15 to 21 months based on a loss amount of between $25,000 and $40,000 and sentenced O'Brien to 15 months' imprisonment. On this appeal, O'Brien argues that the district court erred in allowing him to be questioned about his failure to tell the U.S. Attorney's office that his brother might be responsible. He also contests two upward adjustments made in the calculation of his guideline sentence.

The heart of the evidentiary objection is that the prosecutor's questioning of O'Brien about this failure to mention his brother, and the prosecutor's later statements in closing argument to the jury about this failure, were barred by Doyle v. Ohio, 426 U.S. 610 (1976), and follow-on cases. Jenkins v.

Anderson, 447 U.S. 231, 240 (1980); Fletcher v. Weir, 455 U.S. 603, 606-07 (1982); South Dakota v. Neville, 459 U.S. 553, 565-66 (1983). Doyle held succinctly that "the use for impeachment purposes of petitioners' silence, at the time of arrest and after receiving Miranda warnings, violated the Due Process Clause." 426 U.S. at 619.

Written in the wake of Miranda, Doyle is a case in which a defendant was taken into custody, warned that he had a right to remain silent, and then later impeached at trial--when he offered an alibi--on the ground that he had not mentioned this exculpatory information to the police. Id. at 611-14. In explaining why this was impermissible, Justice Powell said two things: that after such a warning the defendant's silence was "insolubly ambiguous" (because he might just be following the police's advice) and that it was "fundamentally unfair" to tell the defendant he could remain silent and then use that silence against him. Doyle, 426 U.S. at 617-19.

However, in our view the Doyle objection to the question was not properly preserved (no Doyle objection at all was made to the closing argument). Thus, the question for us on review is one of plain error. The legal principle is clear:

> [Where] the ruling is one admitting evidence, a timely objection or motion to strike [must] appear[] of record, stating the specific ground of objection, if the specific ground was not apparent from the context.

-5-

Fed. R. Evid. 103(a)(1).  Because the purpose is to allow the judge to avoid error, the corollary is that to preserve the objection, the "specific ground" stated must be the correct one.  See United States v. Diaz, 300 F.3d 66, 75-76 (1st Cir. 2002).

Here, the objection was not obvious from context.  And although defense counsel gave a specific ground for objecting, it was the wrong ground.  It is true (as defense counsel argued to the judge) that O'Brien was "not under any general obligation to speak to the FBI"; but this is not a valid objection to the question; the adverse inference works, if at all, regardless of "obligation." Nor did the objection raise the Doyle issue, which rests upon two different grounds (ambiguity and unfairness).

This is not necessarily a criticism of defense counsel. No lawyer carries around in his or her head all of the endless precedents on evidence and procedure, and while it would be strange for a defense counsel not to know the Miranda rule, many lawyers have never heard of Doyle.  And neither have many judges: that is why objecting counsel either had to point to Doyle or a counterpart case or had to articulate an objection that was in substance close to the rationale of Doyle.  See Diaz, 300 F.3d at 75-76.

The law is nothing if not practical.  Where objecting counsel offers the right objection, the judge has to get the ruling right and will otherwise be reversed unless the error is patently harmless. United States v. Piper, 298 F.3d 47, 56-57 (1st Cir.

-6-

2002).  If the wrong objection or none at all is offered, the conviction will still ordinarily be reversed if (1) an error occurred in admitting evidence; (2) the error was plain; (3) it likely altered the result; and (4) it reflects some fundamental unfairness.  United States v. Olano, 507 U.S. 725, 732 (1993).  The Olano standard governs here and we are free to apply it even though the government did not urge us to do so.[1]

Whether there was an error at all may be debatable. Between the time of the FBI search of O'Brien's house in January 2001 and his arraignment in May 2003, his failure to disclose his brother's supposed possible culpability is free of any Doyle objection.  Jenkins, 447 U.S. at 240.  O'Brien was neither arrested nor given a Miranda warning at the time of the search.  Thus, neither the language of Doyle ("at the time of his arrest and after receiving Miranda warnings") nor either of its rationales applies. See Weir, 455 U.S. at 607.  Failure to disclose an alibi before any warning is given can be used to impeach the later assertion of that alibi.

Admittedly, at O'Brien's arraignment in May 2003, he apparently was told by the arraigning judicial officer that he had

---

[1]The government invokes plain error review as to the closing argument to which no objection was made, but it assumes that harmless error governs as to the objection on cross-examination (and then argues that, if there was error, it was harmless).  We remain free to apply the correct standard of review.  See United States v. Cudlitz, 72 F.3d 992, 998-99 (1st Cir. 1996).

a right to remain silent. So, arguably <u>Doyle</u> bars any reference by the prosecutor to O'Brien's failure to come forward with the alibi <u>after</u> this warning. <u>See</u> <u>Brecht</u> v. <u>Abrahamson</u>, 507 U.S. 619, 628-29 (1993). The literal language of <u>Doyle</u> may apply in such a case; the force of its rationale might be somewhat weakened in a case where the defendant was not in jail, but might be strengthened if his lawyer warned him not to talk.

The prosecutor's questions in this case did not segment the time periods into before and after the warning; but because O'Brien <u>could</u> be impeached by his pre-arraignment silence, the cross-examination was admissible as to the earlier period (and that lengthy period was perhaps also the more powerful impeachment). Defense counsel suggests that any warning of silence that he (counsel) gave to O'Brien independently triggered <u>Doyle</u> but, timing issues aside, the <u>government</u>'s assurance was the core of <u>Doyle</u>'s due process rationale.

Even if the impeachment as a whole were improper--and we hold that it was not improper as to O'Brien's pre-arraignment silence--it would not be "plainly" so, nor would we say that it had more likely than not altered the outcome. Indeed, the government argues that the cross-examination was harmless beyond a reasonable doubt, which is perhaps further than we would be prepared to go. But under <u>Olano</u> it is enough to sustain the conviction that the

result would quite likely have been the same without the cross-examination or closing.[2]

The jury had evidence from which it could readily conclude that the defendant had both motive and opportunity to commit the offense. O'Brien does not even deny that he was at the computer a few minutes before the initial erasure instructions were sent, and his effort to invoke Aisiku as an alibi probably backfired as a second seeming attempt to manufacture an alibi (just like O'Brien's initial claim to have been in New York on December 18). On this evidence, an acquittal would be surprising, regardless of the objected-to questioning.

Then, at trial, O'Brien revealed, apparently for the first time, that his brother might well be to blame. The brother was no longer available to refute the charge but had no known motive to erase reservations. The idea that he accessed the Amadeus program and accidentally erased a whole set of reservations (seemingly on two separate occasions) appears far-fetched in the extreme. It is more than possible that this purported explanation itself did O'Brien more harm than good--not that he had much to lose by trying, considering the other evidence against him.

_____

[2]Technically, whether an error "affected substantial rights"-- the third prong of Olano--is not always treated as a mechanical matter of probabilities, United States v. Procopio, 88 F.3d 21, 31 (1st Cir.), cert. denied, 519 U.S. 1046 (1996); but likelihood is a central element, id., even though the test is not an inflexible mathematical one. Cf. United States v. Heldeman, 402 F.3d 220, 224 (1st Cir. 2005).

Thus, the impeachment of this very thin effort by O'Brien to blame his brother added something to the prosecutor's case but relatively little. It would be one thing if O'Brien had affirmatively mentioned his brother as a prime possibility in his first encounter with investigators; but the jury was not told that he had. To have the possibility emerge out of the blue at the trial, and after the brother's death, conveyed its own message to any thoughtful jury.

Our view that there was no prejudicial plain error brings us to O'Brien's claims of error at sentencing. The district judge calculated the guideline range with a base level of 4 for property damage or destruction, U.S.S.G. § 2B1.3(a) (2000), adding 6 levels for a loss of $25,000-$40,000, U.S.S.G. § 2B1.1, and then adding 2 levels for obstruction of justice, U.S.S.G. § 3C1.1, and 2 levels for use of a special skill, U.S.S.G. § 3B1.3. On appeal, O'Brien says that the latter two enhancements were error.

The obstruction of justice enhancement rested on O'Brien's trial testimony that he had not erased the reservations but that his brother had done so. Deliberately false testimony by a defendant constitutes obstruction, but inadvertent falsity does not. United States v. Dunnigan, 507 U.S. 87, 94 (1993). Inadvertence is not an issue in this case: O'Brien knew whether he had erased the reservations and, if he did so, both lied in denying it and also knew that his brother had not done the erasing.

-10-

The district judge imposed the enhancement on the ground that the jury, by its verdict, must have found that O'Brien lied. The enhancement requires that the district judge, not the jury, find that the false testimony was willful and material. Dunnigan, 507 U.S. at 95; United States v. Camuti, 78 F.3d 738, 745 (1st Cir. 1996). But O'Brien's complaint is not that the judge relied on the jury: indeed, given the evidence, the judge would surely have found (only a preponderance of the evidence is required) that O'Brien deliberately and materially lied. Rather, O'Brien's primary claim about the enhancement is his contention that the jury was required to make the finding of perjury and that it is unclear that the jury made such a finding.

Under United States v. Booker, 125 S. Ct. 738 (2005), it remains (as before Booker) for the judge to determine the factual basis for an enhancement, United States v. Antonakopoulos, 399 F.3d 68, 80 (1st Cir. 2005), so long as the statutory ceiling is not raised, Booker, 125 S. Ct. at 756. Booker alters the equation only by making the guidelines advisory. Id. at 756-57. No jury determination of perjury was required in this case--although it seems fairly evident to us that the jury did believe that O'Brien lied.

The other enhancement that O'Brien contests is that for using a "special skill" in the commission of the crime. The district judge questioned both sides about the Amadeus airline-

-11-

reservations program and O'Brien's knowledge of it. That knowledge was considerable: O'Brien had in fact taught the subject to others in the travel agency. Consistent with the pre-sentence report, the judge then found the special-skill enhancement to be warranted.

O'Brien says the skill he used was not sufficiently special to qualify under the guideline; but in a similar prior case, arguably presenting stronger facts for the defendant, we held otherwise. United States v. Prochner, 417 F.3d 54, 61 (1st Cir. 2005). See also United States v. Noah, 130 F.3d 490, 499-500 (1st Cir. 1997). Given the special training needed for Amadeus, O'Brien would qualify for the enhancement even under the Sixth Circuit's more defendant-friendly view of the enhancement taken in United States v. Godman, 223 F.3d 320, 322-23 (6th Cir. 2000), a case on which O'Brien relies. In addition, Godman is not the law in this circuit.

O'Brien also says that the enhancement is double counting because the ability to use a computer is "a defining element of the offense," and therefore his skill is implicitly counted against him in the offense itself. Objections to guideline calculations based on "double counting" are a peculiar animal: sometimes the guidelines permit or require what a layman might regard as double

counting and sometimes they do not.[3]  Nor is the case law entirely consistent from one circuit to the next.

The subject is complicated and the government offers a multitude of replies.  We think it is enough to say here that the use of <u>special</u> computer skills is certainly not an element of the statutory offense and that O'Brien was plausibly found to have had such skills beyond those possessed by an ordinary computer user. O'Brien also fits the rationale behind the enhancement, which is the special danger posed by one whose training magnifies or facilitates the potential for harm.  <u>See</u> <u>United States</u> v. <u>Connell</u>, 960 F.2d 191, 198-99 (1st Cir. 1992).

<u>Affirmed</u>.

---

[3]<u>Compare</u> U.S.S.G. § 3B1.1 (adding points for a leadership role in the offense even though leadership role also triggers other enhancements), <u>with</u> U.S.S.G. § 3C1.1 n.7 (prohibiting application of obstruction of justice enhancement for certain offenses on grounds of double counting).  <u>See also</u> <u>United States</u> v. <u>Talladino</u>, 38 F.3d 1255, 1261-62 (1st Cir. 1994).