# United States Court of Appeals
## For the First Circuit

No. 07-2339

UNITED STATES OF AMERICA,

Appellee,

v.

JAMES G. HEBSHIE,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Nancy Gertner, U.S. District Judge]

Before

Howard, Baldock,* and Selya, Circuit Judges.

Jeanne M. Kempthorne for appellant.
Donald L. Cabell, Assistant United States Attorney, with
whom Michael J. Sullivan, United States Attorney, was on brief,
for appellees.

December 4, 2008

---

*Of the Tenth Circuit, sitting by designation.

**BALDOCK**, **Circuit Judge**.  A federal grand jury returned a superseding indictment against Defendant James Hebshie.  The indictment had four counts:  arson, in violation of 18 U.S.C. § 844(i) (Count One); two counts of mail fraud, in violation of 18 U.S.C. § 1341 (Counts Two and Three); and use of fire to commit a felony, in violation of 18 U.S.C. § 844(h)(1) (Count Four).  A petit jury convicted him on all counts.  Now, Defendant appeals his convictions for mail fraud and using fire to commit a felony, i.e., Counts Two, Three, and Four.  We have jurisdiction under 28 U.S.C.` § 1291, and affirm.

I.

We recount the relevant facts in the light most favorable to the Government.  See United States v. Cardoza, 129 F.3d 6, 8 (1st Cir. 1997).[1]  On April 21, 2001, a fire severely damaged a two-story commercial building at 32-34 Main Street in downtown Taunton, Massachusetts.  Defendant leased a portion of the building for his business, the Main Street Lottery & News Store.  On the day of the fire, the Lottery & News Store's alarm system recorded Defendant entering at 8:11 a.m. and leaving at 1:37 p.m.  Seven minutes after Defendant left, the alarm's motion and heat sensors activated, notifying local authorities.  Around the same time, a Taunton Police Officer arrived at the scene and saw dark smoke

---

[1] Defendant's trial began on June 12, 2006 and concluded on June 29, 2006.

-2-

billowing in the Lottery & News Store window.  The fire department arrived shortly thereafter.  Efforts to save the building were unsuccessful. Ultimately, the building collapsed due to structural damage from the fire and attempts to save it with high-powered water hoses.  The next day, officials began a "cause and origin" investigation of the building.  Officials concluded that the fire originated at the Lottery & News Store, and was caused by deliberate human involvement.

Two days after the fire, on April 23, 2001, Defendant filed a claim at the office of his insurance agent.  The agency contacted Commerce Insurance Company (Commerce), the insurance provider, with claim information that same day.  The next day, Peter Rolashevich, a Commerce employee, spoke with Defendant.  When Defendant asked "how quick he could get payment," Rolashevich responded that the claim had been assigned to an independent adjusting firm, Certuse Adjustment, Inc. (Certuse), which would contact Defendant about investigating and processing his claim. The following day, Rolashevich sent Defendant Commerce's standard reservation-of-rights letter (the Rolashevich letter).[2]

_____

[2]The Rolashevich letter, which was addressed to Defendant and Judith Foley at the Lottery & News Store, read in pertinent part:

April 25, 2001

***

Dear Mr. HEBSHIE:

-3-

Thank you for your notice of loss concerning the above captioned matter.

There are issues which need to be clarified, before we can determine whether or not the claim which has been presented is covered by your insurance policy. It is our intention to undertake any investigation that may appear to be necessary or appropriate.

This letter is written to notify you that this company is reserving all of its rights and defenses. Not only such rights and defenses as may now exist, but, in addition, all rights and conditions this company may hereafter have under all of the terms, conditions, provisions and exclusions of your policy, irrespective of whether or not they have been specifically referred to in this letter. It is to be further understood that any action heretofore taken by our company, its agents, representatives, or attorneys in investigating the occurrence involved, or in participating in any settlement discussions or negotiations does not constitute and is not intended as a waiver of any rights of [sic] defenses available to our company, and shall not estop our company from asserting, at a later date, any rights or policy defenses that may be available now or at that time. All of this company's rights are hereby expressly reserved. As our investigation progresses, we will communicate further with you.

This matter requires your immediate attention. Please sign the enclosed copy of this letter where your name appears indicating your receipt of this letter and that you understood the contents of it. Enclosed is a self-addressed stamped envelope for your convenience in returning the signed copy to our office.

Sincerely,

THE COMMERCE INSURANCE COMPANY

PETER ROLASHEVICH
Claim Adjuster

***

One week after the fire, Commerce's cause and origin investigator, Vincent Calenda, conducted a tape-recorded interview with Defendant. After about fifteen or twenty minutes of discussion, Defendant abruptly terminated the interview. While the timing is unclear from the record, Defendant also declined to meet with Glen Williams, the adjuster for Certuse. Commerce was aware that Defendant had refused to meet with Williams on or before May 2, 2001, however, because it sent a letter through its attorney, Lawrence Dugan (the Dugan letter) requesting that Defendant contact Williams. The letter advised Defendant that his refusal to cooperate in the investigation and settlement of his claim could provide Commerce with an independent basis to deny his claim.[3]

---

[3] The Dugan letter, addressed to Defendant at his home address, read in pertinent part:

\*\*\*

May 2, 2001

\*\*\*

Dear Mr. Hebshie:

Please be advised that we have been retained to represent the interests of the Commerce Insurance Company with respect to the matter referenced above. You have been previously advised that the Commerce Insurance Company is proceeding with its investigation into the circumstances of the reported fire and its adjustment of the damage and loss that has resulted, pursuant to a full and complete reservation of rights.

As you know, Glen Williams of Certuse Adjustment, Inc. has been retained by the Commerce Insurance Company to
                                                    (continued...)

(...continued)

assist it with respect to the adjustment of the loss. We have been informed that Mr. Williams has requested an opportunity to meet with you, conduct a recorded interview with you concerning the circumstances surrounding the fire, and the extent of the loss and damage sustained, and obtain your written authorization to obtain from third party sources documents and materials that are relevant to the insurer's investigation and adjustment of the loss. We are further informed that you have stated to Mr. Williams that you will not provide him with a recorded interview or otherwise cooperate with the insurer's ongoing investigation and adjustment activities.

***

Please be advised that the subject insurance policy contains a description of your contractual duties and obligations to the insurer in the event of loss or damage. These duties include, but are not limited to, the requirement that you provide the insurer with inventories of the damaged property, and access to books and records relevant to the loss, but also requires your cooperation with the insurer in its investigation and settlement of the claim. Your refusal to cooperate with the insurer's reasonable request for information and documents may provide the Commerce Insurance Company with an independent basis for it to disclaim all liability to you under the terms and conditions of the subject insurance policy. Accordingly, we request that you contact Mr. Williams immediately upon your receipt of this correspondence in order that the Commerce Insurance Company may receive from you the information and documentation necessary to bring the insurer's investigation and adjustment of this matter to a conclusion.

We are of course, available to discuss this matter with you. if you have any questions, please feel free to telephone.

***

Very truly yours,

(continued...)

Defendant retained an attorney.  Defendant's attorney notified Commerce that his client would no longer communicate with it, but was not waiving any rights he might have to collect on his insurance policy.  Ultimately, Commerce declined Defendant's claim, but the record is unclear on the specific grounds.

II.

At trial, the Government presented evidence that Defendant's business was financially failing and sought to have the jury infer that he had burned down the Lottery & News Store to collect on a $30,0000 insurance policy after attempting unsuccessfully to sell the business.  The evidence included Defendant's erratic behavior during the time frame surrounding the fire and expert testimony opining that the fire was set deliberately.  At the close of the Government's case-in-chief, the Defendant moved for a judgment of acquittal.  See Fed. R. Crim. P. 29(a).  The district court reserved its ruling, but ultimately denied the motion before submitting the case to the jury.

In his own case-in-chief, Defendant attempted to discredit the accuracy of the cause and origin investigation through the testimony of an expert.  The Government rebutted with

---

(...continued)
    MORRISON, MAHONEY & MILLER, LLP
    Lawrence A. Dugan

***

the testimony of a former special agent with the Bureau of Alcohol, Tobacco, and Firearms who reaffirmed the initial conclusion of the cause and origin investigators, i.e., the fire was deliberately set and originated in Defendant's store.

When the district court instructed the jury, Defendant did not object. The jury returned a guilty verdict on all counts. Defendant moved for judgment notwithstanding the verdict, contending the evidence was insufficient to support the convictions. The district court denied the motion, and sentenced Defendant to a fifteen-year term of imprisonment, followed by a two-year term of supervised release. The sentence included 60 months on each of the arson and mail fraud counts, to run concurrently, and a consecutive term of 120 months on the count alleging use of fire to commit a felony. The district court also ordered the Defendant to pay restitution in the amount of $621,389.98.

Defendant made a timely appeal, alleging (1) the Rolashevich and Dugan letters were insufficient to support his mail fraud convictions because they did not further his scheme to collect fraudulently on his insurance policy; (2) the district court clearly erred in instructing the jury on an essential element of the mail fraud counts; and (3) the district court erroneously

concluded that the crime of arson carried a five-year mandatory-minimum term of imprisonment.[4]

## III.

We first consider whether the Government presented sufficient evidence for the jury to conclude that the Rolashevich and Dugan letters furthered Defendant's fraudulent scheme. Defendant contends there is no evidence that these letters furthered his scheme to collect on the insurance policy, and that no rational jury could have concluded otherwise. The Defendant does not appeal the jury's conclusion that he engaged in a fraudulent scheme to collect on his insurance policy. Consequently, we only inquire into the sufficiency of the evidence as to whether the mailings furthered this scheme. Our review is de novo. United States v. Cornier-Ortiz, 361 F.3d 29, 32 (1st Cir. 2004). We inquire "whether, after assaying all the evidence in the light most amiable to the government, and taking all reasonable inferences in its favor, a rational factfinder could find, beyond a reasonable doubt, that the prosecution successfully proved the essential elements of the crime." United States v. O'Brien, 14 F.3d 703, 706 (1st Cir. 1994); see also Jackson v. Virginia, 443 U.S. 307, 319 (1979).

---

[4] Defendant's challenge to the mail fraud counts, if successful, would nullify the charge of using fire to commit a felony because the Government's theory was that Defendant used fire to commit mail fraud.

-9-

Because the district court reserved its ruling on Defendant's motion for judgment of acquittal at the close of the Government's case-in-chief, we assess the sufficiency of the evidence as of the time the district court reserved its ruling. See Fed. R. Crim. P. 29(b); see also United States v. Moran, 312 F.3d 480, 487-88 (1st Cir. 2002). In performing our "limited role in reviewing this evidence" we "neither weigh . . . the credibility of the witnesses nor attempt . . . to assess whether the prosecution succeeded in eliminating every possible theory consistent with the defendant's innocence." United States v. Rivera-Ruiz, 244 F.3d 263, 266 (1st Cir. 2001) (citations omitted).

A.

The crime of mail fraud includes three elements: "(1) a scheme to defraud based on false pretenses; (2) the defendant's knowing and willing participation in the scheme with the intent to defraud; and (3) the use of interstate mail . . . communications in furtherance of that scheme."[5] United States v. Cheal, 389 F.3d 35,

---

[5] The relevant language of the mail fraud statute at the time of the incident provided:

> Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, . . . for the purpose of executing such scheme or artifice . . . , places in any post office . . . any matter or thing whatever to be sent or delivered by the Postal Service, . . . or takes or receives therefrom, any such matter or thing, or knowingly causes to be delivered by mail . . . according
>
> (continued...)

41 (1st Cir. 2004). Importantly, the last element, which we will refer to as the "mailing element," requires that the defendant both (1) <u>cause</u> the use of the mails, which includes reasonably foreseeable mailings, <u>and</u> (2) use the mails <u>for the purpose</u>, or <u>in furtherance</u>, of executing the scheme to defraud.[6] <u>See</u> <u>United States</u> v. <u>Moss</u>, 591 F.2d 428, 436 (8th Cir. 1979).

The "in furtherance" requirement is to be broadly read and applied. <u>See</u> <u>United States</u> v. <u>Koen</u>, 982 F.2d 1101, 1107 (7th Cir. 1992). To further Defendant's fraudulent scheme, the mailings need not be an "essential element" of the scheme. <u>Pereira</u> v. <u>United States</u>, 347 U.S. 1, 8 (1954). They simply must be "sufficiently closely related" to the scheme, <u>United States</u> v. <u>Maze</u>, 414 U.S. 395, 399 (1974), such that they are "incident to an essential part of the scheme," <u>Pereira</u>, 347 U.S. at 8, or "a step in [the] plot." <u>Schmuck</u> v. <u>United States</u>, 489 U.S. 705, 715 (1989). Although we have observed that "the scheme's completion or the prevention of its detection must have depended in some way on the mailings," <u>United States</u> v. <u>Pacheco-Ortiz</u>, 889 F.2d 301, 305 (1st

(...continued)
> to the direction thereon, . . . any such matter or thing,
> shall be fined under this title or imprisoned not more
> than five years, or both.

18 U.S.C. § 1341 (2000).

[6] We have used the terms "in furtherance of" a fraudulent scheme and "for the purpose of" executing a fraudulent scheme interchangeably in this context. <u>See</u> <u>United States</u> v. <u>Pimental</u>, 380 F.3d 575, 586 (1st Cir. 2004).

-11-

Cir. 1989) (citation omitted), we have not required a "but-for" link between a mailing and the fraudulent scheme. See United States v. Pimental, 380 F.3d 575, 587 (1st Cir. 2004). Rather, a mere "connection or relationship" is sufficient. Id. at 587 n.5. "The relevant question at all times is whether the mailing is part of the execution of the scheme as conceived by the perpetrator at the time, regardless of whether the mailing later, through hindsight, may prove to have been counterproductive and return to haunt the perpetrator of the fraud." Schmuck, 489 U.S. at 715.

Courts have generally held that mailings sent in connection with insurance claims further an insurance fraud scheme. See United States v. Tocco, 135 F.3d 116, 125 (2d Cir. 1998). For example, in United States v. Morrow, 39 F.3d 1228, 1237 (1st Cir. 1994), we held that an insurer's letter acknowledging it received a claim was incident to an essential element of the defendant's scheme to collect fraudulently on an insurance policy. The letter was part of "the criss-cross of mailings that would reasonably be expected when false claims are submitted to insurance companies, are processed, and are ultimately paid, thereby making the fraud successful." Id. We observed that "[p]recedent amply supports the use of mailings to and from the insurer or agent to supply this element under the statute." Id. (citations omitted).

Likewise, in United States v. Contenti, 735 F.2d 628, 632 (1st Cir. 1984), we determined that several mailings were each

-12-

sufficient to support the jury's finding that they furthered the defendant's fraudulent scheme to collect on insurance proceeds. Among these mailings, we held that a proof of loss sent to the insurance broker was "an essential part of the process leading to payment of the claim." Id. We also determined that mailings arranging for the defendant to give his sworn statement furthered the defendant's scheme because they were "one of the customary steps leading to settlement, payment or denial of the claim" and "were prompted by [the defendant's] submission of his proof of loss and furthered the processing of the claim." Id.

To summarize these and additional cases regarding the "criss-cross of mailings," Morrow, 39 F.2d at 1237, involved in processing a fraudulent insurance claim, we have held that mailings (1) summarizing defendant's fraudulent statements, see Pimental, 380 F.3d 575, Contenti, 735 F.2d at 632; (2) acknowledging receipt of claims, see Morrow, 39 F.3d 1228; Contenti, 735 F.2d 632; (3) expressing doubt regarding the validity of a claim accompanying a proof of loss statement, see Serino, 835 F.2d 924; (4) containing a proof of loss only, see Contenti, 735 F.2d 628, or a proof of loss along with a non-waiver agreement, see Serino, 835 F.3d at 928; (5) arranging for the defendant to give his sworn statement, see id. at 628; (6) intercepting and converting insurance refund checks, see United States v. Martin, 694 F.2d 885 (1st Cir. 1982); (7) lying about conversion of a refund check, id. at 890;

-13-

(8) falsifying insurance applications, see id.; and (9) receiving the subsequent return mailings of falsified insurance policies, see id.; all furthered various insurance fraud schemes.

B.

Count Two of the indictment in this case is premised on the Rolashevich letter. Defendant argues that the purpose of the letter was to notify him that Commerce was not conceding liability. Therefore, Defendant contends, no reasonable jury could have found the Rolashevich letter was "in furtherance" of Defendant's fraudulent scheme. As we have explained, the "in furtherance" requirement is a subpart of the mailing element in the statute. Moss, 591 F.2d at 436. This requirement has been a thorn in the side of reviewing courts for decades. See, e.g., United States v. Curry, 681 F.2d 406, 411 (5th Cir. 1982) ("Since the mail fraud statute was enacted, courts have been plagued by difficulties in defining the necessary degree of connection between a mailing and a scheme to defraud."). But this appears to be the first time a federal appeals court has considered whether an insurer's reservation-of-rights letter may, standing alone, support a conviction for mail fraud.

We achieved a near miss on this question in United States v. Serino, 835 F.2d 924 (1st Cir. 1987), where we held that a mailing containing both a proof of loss statement and a non-waiver

agreement[7] together furthered defendant's insurance fraud scheme because the mailing contained "false statements" and "was an essential step toward the defendants obtaining payment." Id. at 928. But we also explained in Serino that, where one document in a mailing is independently sufficient to further a fraudulent scheme, the presence of other documents that might "hinder" or contain "expressions of doubt about the validity of the [fraudulent] claims does not sever those expected and necessary mailings from the fraudulent scheme." Id. at 928-29. We determined "[i]t is not necessary . . . that each mailing guarantee the success of the scheme, or even significantly advance it," as long as the mailing is closely related to the scheme. Id. at 928. It was sufficient in Serino that the mailings were "incident to defendants' efforts in furtherance of the scheme." Id. In Serino we did not consider, however, whether the non-waiver agreement, standing alone, furthered the insurance fraud scheme. Therefore, the question whether a reservation-of-rights letter may be "part of the execution of the scheme as conceived by the perpetrator at the

---

[7] A non-waiver agreement and a reservation-of-rights letter constitute two sides of the same coin. A "nonwaiver agreement" occurs when "the insured acknowledges that the insurer's investigation or defense of a claim against the insured does not waive the insurer's right to contest coverage later." Black's Law Dictionary 1085 (8th ed. 2004); see also 13 Couch on Insurance § 194:34 (3d 1995) (describing non-waiver agreements). A "reservation-of-rights letter" is a "notice of an insurer's intention not to waive its contractual rights to contest coverage or to apply an exclusion that negates an insured's claim." Black's Law Dictionary 1334 (8th ed. 2004).

time" is a matter of first impression in this circuit. Schmuck, 489 U.S. at 715.

Analyzing the substance of the Rolashevich letter, we do not find it altogether unlike other mailings we have found capable of furthering insurance fraud schemes. The first sentence of the Rolashevich letter thanked Defendant for his notice of loss, essentially acknowledging Commerce's receipt of his claim. See supra note 2. Courts have consistently held that letters of acknowledgment are sufficient to support a conviction for mail fraud. See Morrow, 39 F.3d at 1237; Contenti, 735 F.2d at 632; see also United States v. Owen, 492 F.2d 1100, 1103 (5th Cir. 1974) (finding confirmatory letter "in accord with business practices associated with the sale of goods" to be sufficiently closely related to a scheme to fraudulently receive goods). Here, essential elements of Defendant's scheme included (1) filing a fraudulent claim and (2) successfully deceiving the insurer throughout the ordinary claims investigation process.

The Rolashevich letter was the beginning of what we have described as "the criss-cross of mailings that would reasonably be expected when false claims are submitted to insurance companies, are processed, and are ultimately paid, thereby making the fraud successful." Morrow, 39 F.3d at 1237. Although the Rolashevich letter did not "guarantee the success of the scheme, or even significantly advance it," Serino, 835 F.2d at 928, the letter was

-16-

"incident to an essential part" of Defendant's scheme, i.e., successfully navigating Commerce's claims investigation. See Pereira, 347 U.S. at 8. Defendant's "completion" of the scheme or "prevention of its detection" did not "depend" on the letter in a "but-for" sense. Pimental, 380 F.3d at 587. But the Rolashevich letter had a sufficient "connection or relationship" to the claims process. Id. at 587 n.5. We conclude that a reasonable jury could find it was "part of the execution of the scheme as conceived by the perpetrator at the time." Schmuck, 489 U.S. at 715.

We acknowledge that the portion of the Rolashevich letter reserving Commerce's rights to deny payment could "through hindsight . . . return to haunt" the Defendant. Id. That is not enough, however, to vitiate the connection between the letter and Defendant's scheme. The Rolashevich letter "may not have contributed directly to the duping" of Defendant's victims but it was nonetheless incident to an essential element of his scheme. Schmuck, 489 U.S. at 711-12.

Defendant contends that the decisions in United States v. Maze, 414 U.S. 395 (1974), United States v. Pietri Giraldi, 864 F.2d 222 (1st Cir. 1988) (per curiam), and United States v. Castile, 795 F.2d 1278 (6th Cir. 1986) demonstrate that no reasonable jury could have found the mailings sufficient here. We find these precedents readily distinguishable.

In Maze, the Supreme Court held that invoices mailed to credit-card-issuing banks from motel operators defrauded by the defendant with stolen credit cards could not support convictions for mail fraud. 414 U.S. at 401. The Court reasoned that the defendant's scheme already "reached fruition when he checked out of the motel, and there was no indication that the success of his scheme depended in any way on which of his victims ultimately bore the loss." Id. at 402. Here, by contrast, Defendant's scheme depended on successfully deceiving Commerce until it had paid his fraudulent insurance claim. Thus, the scheme had not "reached fruition," before the mailings.

In Pietri Giraldi, we held that telexes sent between banks to verify a bogus certificate of deposit the defendant supplied as security for a debt were not in furtherance of his scheme of lulling a customer into refraining from legal action to recover the debt.[8] 864 F.2d at 225. The telexes "could only (and did) lead to the discovery that the certificate of deposit was false." Id. (emphasis added); see also id. at 226 (noting the telexes "did not engender any circumstances in which [the defendant] could do anything to forestall discovery . . . , the telexes . . . could only result in detection of the scheme") (emphasis added).

_____

[8] "[C]ase law construing 18 U.S.C. § 1341 (mail fraud) is instructive for purposes of § 1343 [wire fraud]." Pietri Giraldi, 864 F.2d at 224 (citation omitted). The reverse is also true here.

-18-

The Rolashevich letter here was not so singular in its purpose. Although it reserved Commerce's rights and mentioned the possibility of an investigation, it vacillated on whether an investigation would even be necessary, stating "[i]t is our intention to undertake any investigation that may appear to be necessary or appropriate." See supra note 2. Unlike Pietri Giraldi, Defendant could have continued to "forestall discovery" of his scheme by cooperating with Commerce's claims processing efforts.

Finally, the Sixth Circuit's decision in Castile warrants a close look. In that case, the court held that letters concerning an insurance company's investigation into the possibility the defendant committed arson were not in furtherance of his scheme to collect fire insurance proceeds. See 795 F.2d at 1280-81. Four letters were mailed between the insurance company and its agents in the course of the investigation. See id. at 1279-80. After analyzing the substance of the letters, the court concluded that the "purpose of the mailings was to defeat a fraudulent scheme." Id. at 1281.

Defendant contends that the letters here were similarly investigatory in nature and thus served to undermine—rather than advance—his fraudulent scheme. But most actions of an insurance company in the course of ordinary claim processing and adjusting

-19-

could be characterized as "investigative."[9] The "investigation" in Castile was focused, however, on confirming the insurer's pre-existing suspicions about the validity of the defendant's claim. In that case, the defendant made a prior claim on the same property resulting in a substantial settlement. Id. at 1274. Subsequently, the defendant made another claim on the same property for destruction of a restaurant he built with money from the first settlement. Id. The skeptical insurer "began an investigation of the fire to determine the cause of the fire and whether the person named on the policy was involved." Id. at 1275 (emphasis added).

The record in this case reveals that Commerce's actions in processing Defendant's claim were qualitatively different than the investigation in Castile. Testimony elicited on cross-examination of Peter Rolashevich by defense counsel indicated that his letter on behalf of Commerce was an ordinary, "stock" letter in accord with insurance business practices.[10] In describing the

---

[9] See generally 14 Couch on Insurance § 198:27 (observing "[i]nsurers have a duty to investigate claims filed by the insured"); id. § 198:28 ("The duty [to investigate] requires that the insurer investigate before it denies or settles a claim."); id. § 198:29 ("An insurer's duty to investigate is triggered when its insured first makes a claim.").

[10] The questions between defense counsel and Rolashevich were as follows:

Q:   Then I think you testified that you talked to some other people and sent a reservations [sic] rights letter to the insured?
A:   Yes.

(continued...)

actions that Commerce took while handling Defendant's claim, Rolashevich said they were consistent with "basic investigation" practices and "standard questioning" the company used in all claims processing.[11]

Thus, the record indicates that, at the time the Rolashevich letter was mailed, Commerce was engaging in standard claims investigation and processing practices not characterized by a particular, pre-existing suspicion of Defendant. By contrast, the investigation in <u>Castile</u> was motivated by a particularized suspicion of a defendant due to his prior insurance claim filed under substantially similar circumstances. <u>See</u> <u>Castile</u>, 795 F.2d at 1275. We cannot say here that any reasonable jury would have

_____

(...continued)

Q:  And that reservations [sic] rights letter is a standard letter that's used in many cases when the insurer wants to conduct an additional investigation or a thorough investigation concerning loss?
A:  Yes
Q:  That's an ordinary letter, that's almost a stock letter?
A:  Yes

[11] Despite acknowledging Commerce signified the need for an "additional . . . or [more] thorough" investigation in sending the Rolashevich letter, <u>see supra</u> note 10, Rolashevich subsequently acknowledged that the independent investigators employed by Commerce were "routine," or employed "all the time," and there was nothing "unusual" about hiring them. Reaffirming this point, on redirect Rolashevich again acknowledged the initial intake conversation following a claim was not intended to acquire all the information needed to complete processing. In the ordinary case, further investigation was designed to procure all the needed information for Commerce.

found the "purpose of the [Rolashevich letter] was to defeat a fraudulent scheme."  Id. at 1281.

### C.

Defendant also challenges the sufficiency of the evidence on the second mail fraud count, relying on the same precedents we have previously discussed, i.e., Maze, Pietri Giraldi, and Castile. We need not tarry long, having already held that "mailings arrang[ing] for [an insured] to give his sworn statement, [are] one of the customary steps leading to settlement, payment or denial of the claim, [and are] prompted by [the insured's] submission of his proof of loss and further[] the processing of the claim." Contenti, 735 F.2d at 632.  But Defendant assails the Dugan letter on the ground that its sole purpose was to advise him of an independent basis for disclaiming liability.

To be sure, the letter contains both the proverbial "carrot" and "stick."  On one hand, the letter's "carrot" notified Defendant that, by contacting Williams and participating in his investigation, Defendant could bring Commerce's inquiry "to a conclusion."  See supra note 3.  As the insurance company's routine investigation had to end before Defendant could obtain payment, this portion of the letter discussed a "necessary step in the continued relationship between the defendant and the insurance company," which advanced Defendant's fraudulent scheme.  Pimental, 380 F.3d at 586.  On the other hand, the Dugan letter's "stick"

-22-

threatens Defendant's scheme by citing his failure to cooperate as an independent basis for disclaiming liability under the policy.

In our view, the stick in this case is clearly analogous to the insurance company's "expressions of doubt" regarding the fraudulent claim presented in Serino, 835 F.2d at 928-29. Just as the "expressions of doubt" in that case, which arguably did not further the defendant's scheme, failed to nullify the proof of loss statement, which did, the "stick" in this case is incapable of "sever[ing]" the carrot "from [Defendant's] fraudulent scheme." Id. at 928. That Defendant refused to bite and evaded contact with investigators, as their suspicions rose, is immaterial. The law is clear that mailings do not cease to be in furtherance of a fraudulent scheme merely because they prove "through hindsight" to have been "counterproductive." Schmuck, 489 U.S. at 715. Accordingly, we conclude that a reasonable jury could determine that both the Rolashevich and Dugan letters furthered Defendant's scheme to collect fraudulently on his insurance policy.

IV.

Next, we consider Defendant's challenge to the district court's jury instructions on the "in furtherance" requirement of mail fraud. We review the district court's jury instructions as a whole to determine "if they adequately explained the law or whether they tended to confuse or mislead the jury on controlling issues." United States v. Griffin, 524 F.3d 71, 76 (1st Cir. 2008) (citation

-23-

omitted). Because Defendant failed to object to the instruction, we review for plain error. See Ramirez-Burgos v. United States, 313 F.3d 23, 28 (1st Cir. 2003). Under plain error review, a defendant must first demonstrate an error that is plain. See id. at 29. Even if a defendant demonstrates such an error, we may only take corrective action if the error not only prejudices the defendant's substantial rights, but also seriously affects the fairness, integrity, or public reputation of judicial proceedings. See id. At the outset, we observe that "[i]t is the rare case in which an improper instruction will justify reversal of a criminal conviction when no objection has been made in the trial court." Henderson v. Kibbe, 431 U.S. 145, 154 (1977); see also United States v. Gomez, 255 F.3d 31, 37 (1st Cir. 2001) (noting that "the plain-error exception is cold comfort to most defendants pursuing claims of instructional error").

## A.

We consider the first two prongs of plain error review together. Defendant must demonstrate that an "error" actually occurred. For purposes of plain error review, an "error" is a "[d]eviation from a legal rule." Olano, 507 U.S. at 732-33. It is not enough, however, that an error occurred—the error must also be "plain." Id. at 734. "Plain" is synonymous with "clear" or "obvious." See id.; see also Griffin, 524 F.3d at 76. We conclude that such an obvious deviation from a legal rule occurred here.

The district court, in the course of its oral instructions to the jury, mentioned the "in furtherance" requirement of the mailing element four times. First, in summarizing the three elements of mail fraud, the court described "the use of the U.S. mail on the date charged in furtherance of the scheme" as the final element. After describing the first two elements of mail fraud in detail, the district court began a cursory summary of the mailing element because it apparently believed this element was not contested at trial:[12]

> THE COURT: [T]he use of the U.S. mail on or about the
> date charged in furtherance of the scheme,
> and that has been stipulated to, is that
> correct, the use of the mails in connection?
> MR. SPINALE: No, it has not.
> THE COURT: No, it has not.

Upon learning that the element actually _was_ contested, the district court proceeded to define it. This discussion is where the district court deviated from the correct legal definition of mail fraud by conflating the two separate components of the mailing element:

> The third element is the use of the mail on or about the date charged. The government must establish beyond a reasonable doubt that the defendant used the mail in . . . _furtherance_ of the crime charged. . . . [T]he crime of mail fraud does require that the government prove beyond a reasonable doubt that the mails were in fact used in some manner _to further_ such a scheme for the

---

[12] The district court's assumption was perfectly reasonable, given defense counsel's failure to address the element at trial—a matter we will presently discuss in greater detail. _See_ _infra_ Part IV.B.

-25-

purposes of obtaining money by means of false or fraudulent pretenses <u>or</u> that the use of the mails would ordinarily follow in the usual course of business or events or that the use of the mails was reasonably foreseeable.

(emphasis added). Using the word "or" in the last sentence above, instead of "and," made the instruction incorrect. <u>See generally</u> <u>Maze</u>, 414 U.S. at 400, 405; <u>Pereira</u>, 347 U.S. at 8-9.

Finally, after incorrectly defining the mailing element, the district court mentioned it again in its summation of the elements of mail fraud:

So, with respect to mail fraud, then . . . there are, as I said, three elements, . . . [first,] the existence of a scheme to defraud . . . second, the defendant's knowing and willful participation in this scheme with the intent to defraud . . . and, third, <u>the use of the mail on or about the date charged in furtherance of the scheme</u>.

(emphasis added).

As mentioned, the district court's error occurred when it explained the mailing element of the statute, conflating the "causation" requirement with the "in furtherance" requirement. "The mailing element of 18 U.S.C. § 1341 consists of two requirements: (1) that the defendant 'caused' the use of the mails and (2) that the use was [in furtherance, or] 'for the purpose of executing' the scheme to defraud. <u>Moss</u>, 591 F.2d at 436; <u>see also</u> <u>Cheal</u>, 389 F.3d at 41; <u>Pimental</u>, 380 F.3d at 584. But the district court's instruction here allowed the jury to find the mailing element satisfied if "the use of the mails would ordinarily follow in the usual course of business" <u>or</u> if "the use of the mails was

-26-

reasonably foreseeable." Although the instruction stated the government must demonstrate "that the mails were in fact used in some manner to further" Defendant's insurance fraud scheme, the instruction phrased this mandatory element of mail fraud as a permissible alternative that was unnecessary if the jury found causation.

The Government contends that the district court's instructions were not erroneous because it "correctly stated the element at least three other times, both before and after the misstatement," and thus "cured" the "misstatement." We reject this argument for two reasons. First, if the jury questioned the requirements for satisfying the mailing element it would naturally gravitate to the district court's most thorough and specific definition, not the three other summaries. This conclusion is reinforced by the district court's own directions. The court told the jury to interpret its summary of the elements as an "outline" and its more specific descriptions as definitions. See Trial Tr. 7:14 ("The way this works, I'll outline the elements for you, and then I'll define them more specifically."). The Government's argument that a jury would likely ignore this error merely because of other statements of summation ignores "the almost

invariable assumption of the law that jurors follow their instructions." Richardson v. Marsh, 481 U.S. 200, 206 (1987).[13]

More importantly, the district court's final statement was not a correction, but rather a summation; thus, no reason existed for the jury to think an error had been corrected, or even occurred. Lack of an explicit correction to cure the erroneous instruction distinguishes this case from United States v. Rodriquez, 525 F.3d 85 (1st Cir. 2008), where we determined an "immediate correction" to a misstatement in a jury instruction precluded a finding of plain error. Id. at 106 (emphasis added). If the district court had merely summarized the statutory elements without defining them nothing would likely have been amiss. See Davis v. McAllister, 631 F.2d 1256, 1260 (5th Cir. 1980) ("The mere fact that the trial court failed to elaborate or enlarge its instructions beyond setting forth the statutory elements of the offense does not constitute constitutional error."). But once a

---

[13] We do not hold that we would find a plain error in every case where jury instructions contain an erroneous statement of the law accompanied by other correct statements. For example, an erroneous statement may be so clearly contradicted by other correct statements that any error is neutralized. See United States v. Duncan, 855 F.2d 1528, 1532-33 (11th Cir. 1988) (holding erroneous statement allowing jury to convict even if all elements of a crime were not proven was neutralized by other statements at the beginning of the trial and in final closing instructions clearly contradicting the error "such that reasonable jurors would not have been misled," because other statements required "that all of the essential elements of [the crime] had to be proven"). Here, however, the correct summaries of the mailing element did not so clearly contradict the district court's erroneous explication of it that we could say the summaries neutralized the error.

court sets out to define each element of an offense in addition to summarizing, it cannot wipe the slate clean of erroneous <u>specific</u> definitions by pointing to the correctness of <u>general</u> summaries. "Ordinarily, where a specific provision conflicts with a general one, the specific governs." <u>Edmond</u> v. <u>United States</u>, 520 U.S. 651, 657 (1997). In light of the established definition of the mailing element at the time the district court gave this instruction, see <u>Maze</u>, 414 U.S. at 400, 405; <u>Pereira</u>, 347 U.S. at 8-9, we cannot help but conclude that the instruction deviated from the clear legal definition of mail fraud. Thus, the first two elements of plain error review are satisfied.

### B.

Although the Supreme Court has recognized a tightly circumscribed category of "structural errors" that alter "the framework within which the trial proceeds, rather than simply . . . the trial process itself," <u>Arizona</u> v. <u>Fulminante</u>, 499 U.S. 279, 310 (1991), errors in jury instructions do not generally fit within this category. <u>See</u> <u>Neder</u> v. <u>United States</u>, 527 U.S. 1, 9 (1999) (holding that the omission of a single element of a criminal offense from a jury instruction is not structural error). Because the district court's misdescription of an element of the mail-fraud statute does not amount to structural error, Defendant bears the heavy burden of demonstrating prejudice. <u>See</u> <u>Ramirez-Burgo</u>, 313 F.3d at 29. To satisfy this burden, he must show that

-29-

the error likely "affected the outcome of the district court proceedings." Olano, 507 U.S. at 734. In other words, the Defendant must show "'a reasonable probability that, but for [the error claimed], the result of the proceeding would have been different.'" United States v. Padilla, 415 F.3d 211, 221 (1st Cir. 2005)(en banc)(quoting United States v. Dominguez Benitez, 542 U.S. 74, 82 (2004)). Although the reasonable-probability standard is demanding, it "is not the same as, and should not be confused with, a requirement that a defendant prove by a preponderance of the evidence that but for [the] error things would have been different." Dominguez Benitez, 542 U.S. at 83 n.9. Nevertheless, "it is enough to sustain the conviction that the result would quite likely have been the same" despite an erroneous instruction. United States v. O'Brien, 435 F.3d 36, 40 (1st Cir. 2006).

Without citing any authority, Defendant makes three arguments that the erroneous instruction in this case prejudiced him. We consider each argument in turn. First, Defendant contends that the instruction prejudiced him because it eliminated an element of the crime of mail fraud. But this alone is insufficient to demonstrate prejudice. In Neder, the Supreme Court considered an error in jury instructions that omitted materiality, which the court held was an element of the mail, wire, and bank fraud statutes the defendant was charged with violating. 527 U.S. at 8. The Court affirmed the convictions because it concluded that the

-30-

government met its burden of demonstrating the error was harmless beyond a reasonable doubt. Id. at 16. Here, because Defendant did not object to the erroneous instruction, he must satisfy the difficult standard of showing "a likely effect on the outcome or verdict." Dominguez Benitez, 542 U.S. at 82 n.7. The mere fact that an erroneous instruction resulted in the omission of an element of the offense is not alone sufficient to demonstrate a prejudicial affect on the outcome of the trial. See Olano, 507 U.S. at 734 (holding "in most cases" a showing of prejudice requires that the error "must have affected the outcome of the district court proceedings"); see also Dominguez Benitez, 542 U.S. at 81 ("To affect 'substantial rights,' . . . an error must have 'substantial and injurious effect or influence in determining the . . . verdict." (quoting Kotteakos v. United States, 328 U.S. 750, 776 (1946)).

Second, Defendant contends that the district court's instruction prejudiced him because the jury never heard anything to correct the error. Accepting this argument would require us to hold that every instructional error has a prejudicial impact on judicial proceedings. We have already explained that this is not the law. "Where the effect of an alleged error is so uncertain, a defendant cannot meet his burden of showing that the error actually affected his substantial rights." Jones v. United States, 527 U.S. 373, 394-95 (1999); see also United States v. Moran, 393 F.3d 1, 2

(1st Cir. 2004) (noting that under plain error review defendant must show improper instruction affected the outcome of the trial).

Third, Defendant suggests that if the jury was properly instructed "it seems more than likely" that it would have acquitted him of both the mail fraud counts because of "the lack of evidence." In light of Defendant's trial strategy and the evidence presented, we disagree. At trial, Defendant focused exclusively on rebutting the arson charge and the existence of a scheme to defraud his insurance provider. We seriously doubt that the jury would have changed its verdict if the district court had used the word "and" instead of the disjunctive "or" without any relevant argument presented by defense counsel.

We also reject Defendant's characterization of the evidence. The Dugan letter was strong evidence supporting the mail fraud conviction given our holding in Contenti. See supra Part III.C. The testimony at trial also provided ample ground for a reasonable jury to conclude the Rolashevich letter was part of Commerce's standard claims process. See supra Part III.B.; see also Neder, 527 U.S. at 18 (affirming convictions in spite of instructional error where the evidence made it clear that a rational jury would have found defendants guilty even if properly instructed). Faced with uncontroverted evidence, we think it quite likely that a properly instructed jury would have found Defendant

guilty of both counts of mail fraud.[14] See O'Brien, 435 F.3d at 40 (holding "it is enough to sustain the conviction that the result would quite likely have been the same" despite an erroneous instruction).

V.

Finally, we consider Defendant's challenge to his sentence. The arson statute provides that a person violating it "shall be imprisoned for not less than 5 years and not more than 20 years, fined under this title, or both." 18 U.S.C. § 844(i). The district court interpreted this language to impose a mandatory five-year term of imprisonment, and sentenced Defendant accordingly. On appeal, Defendant contends the "or both" clause allowed the court to impose a fine instead of imprisonment, a result the record indicates the district court might have favored if it had the choice. Defendant further contends we should review the district court's interpretation of § 844(i) for harmless error because he raised an argument based on the statutory language

---

[14] Had Defendant met his burden of demonstrating prejudice, we would still be disinclined to determine the error seriously affects the fairness, integrity, or public reputation of judicial proceedings. See Olano, 507 U.S. at 732 (noting the discretionary nature of plain error review). Because the evidence was not closely contested at trial and we have found it sufficient to support Defendant's conviction, we are reluctant to disturb the jury's verdict. See United States v. Gee, 226 F.3d 885, 896 (7th Cir. 2000) (holding that despite prejudice, whether to reverse for plain error was "a difficult question when the evidence was sufficient to support a conviction," but ultimately reversing under Olano's third prong because issue was "closely contested and conflicting evidence was presented").

-33-

below, albeit not the same contention he advances now.[15]  The Government urges that plain error review should apply.  We need not resolve this dispute, as we would affirm the district court under either standard of review.

At the outset, we note that our sister circuits have routinely assumed that § 844(i) mandates a minimum term of imprisonment.  See, e.g., United States v. Gibney, 519 F.3d 301, 304 (6th Cir. 2008); United States v. Gillespie, 452 F.3d 1183, 1191 (10th Cir. 2006); United States v. Uphoff, 232 F.3d 624, 626 (8th Cir. 2000); United States v. Zendeli, 180 F.3d 879, 881 (7th Cir. 1999).  We conclude that the structure of § 844(i) compels this reading.  The provision stating that a violator of § 844(i) "shall be imprisoned" is mandatory as to that clause, thus requiring a minimum five-year term of imprisonment.

We are persuaded by the Second Circuit's reasoning in United States v. Detrich, 940 F.2d 37 (2d Cir. 1991), in which the court construed similar language found in 21 U.S.C. § 960(b)(2). "Although this portion of the statute could have been more artfully drafted, the structure of [§ 844(i)] makes it readily apparent that the district court must impose a [minimum] prison sentence of five

---

[15] At sentencing, defense counsel argued that § 844(i) did not impose a mandatory minimum because it lacked language that appeared in § 844(h)("Notwithstanding any other provision of law, the court shall not place on probation or suspend the sentence of any person convicted of a violation of this subsection.").  Defendant explicitly abandoned this argument on appeal.

years." Id. at 39.[16] The remainder of the disputed portion of § 844(i) ("fined under this title, or both"), however, contains no such mandatory language, and merely indicates that a fine may also be imposed. Having rejected Defendant's interpretation of § 844(i), we affirm his sentence.[17]

For the foregoing reasons, we affirm the district court's judgment in all respects.

---

[16] Defendant's arguments to the contrary, which are based on two of our prior cases involving a different statute, do not persuade us. In United States v. Colon-Ortiz, 866 F.2d 6, 9 (1st Cir. 1989), for example, the Government conceded that the language of a prior version of 21 U.S.C. § 841(b)(1)(B) was ambiguous. No such concession exists here. Further, the language the Defendant relies on from United States v. McMahon, 935 F.2d 397, 400 (1st Cir. 1998) is clearly dictum. In any event, we gave mere lip service to the defendant's assertion in that case that § 841(b)(1)(B) was ambiguous, noting the "general unanimity" among the circuits that § 841(b)(1)(B) required a mandatory five-year prison term. Id.

[17] In his opening brief, Defendant maintained that his convictions should be reversed because the district court admitted, over his objection, evidence of the financial losses of the 32-34 building's occupants. Defendant failed to respond to the Government's contention that the evidence was relevant to prove destruction of property under 18 U.S.C. § 844(i) and to "draw the sting" of any potential bias the jury might have concluded the witnesses possessed. After reviewing the record, we conclude the district court did not abuse its discretion in admitting this evidence. See United States v. Brown, 450 F.3d 76, 78 (1st Cir. 2006) (holding evidentiary rulings objected to at trial are reviewed for an abuse of discretion).