# United States Court of Appeals
## For the First Circuit

Nos. 16-1507
     16-1527
     16-1596
     16-1984
     17-1660


UNITED STATES OF AMERICA,

Appellee,

v.

VICTOR M. RODRÍGUEZ-TORRES, a/k/a Cuca;
TARSIS GUILLERMO SÁNCHEZ-MORA, a/k/a Guillo;
REINALDO RODRÍGUEZ-MARTÍNEZ, a/k/a Pitbull;
PEDRO VIGIO-APONTE, a/k/a Pedrito and He Man;
CARLOS M. GUERRERO-CASTRO, a/k/a Carlitos el Negro,

Defendants, Appellants.


APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. José Antonio Fusté, U.S. District Judge]


Before

Torruella, Thompson, and Kayatta,
Circuit Judges.


Lydia Lizarríbar-Masini for appellant Víctor M. Rodríguez-Torres.

Theodore M. Lothstein, with whom Lothstein Guerriero, PLLC, was on brief, for appellant Tarsis Guillermo Sánchez-Mora.

Vivian Shevitz for appellant Reinaldo Rodríguez-Martínez.

Jamesa J. Drake, with whom Drake Law, LLC was on brief, for appellant Pedro Vigio-Aponte.

Raúl S. Mariani-Franco on brief for appellant Carlos M. Guerrero-Castro.

Stratton C. Strand, Attorney, Criminal Division, Appellate Section, U.S. Department of Justice, with whom Brian A. Benczkowski, Assistant Attorney General, and Matthew S. Miner, Deputy Assistant Attorney General, Rosa Emilia Rodríguez-Vélez, United States Attorney, Alberto R. López-Rocafort, Assistant United States Attorney, and Victor O. Acevedo-Hernández, Assistant United States Attorney, were on brief, for appellee.

---

September 18, 2019

---

**THOMPSON**, <u>Circuit Judge</u>.

### PREFACE

La Rompe ONU (just "La Rompe" from now on) was one of the largest and most violent of Puerto Rico's street gangs. Another was La ONU. Deadly rivals, each wreaked much havoc on Puerto Rico through serial drug sales, violent robberies and carjackings, and ghastly killing sprees.

After law enforcement took La Rompe down, La Rompe members Rodríguez-Torres, Sánchez-Mora, Rodríguez-Martínez, Vigio-Aponte, and Guerrero-Castro (their full names and aliases appear above) found themselves indicted, then convicted, and then serving serious prison time for committing some or all of the following crimes: conspiracy to violate RICO (short for "Racketeer Influenced and Corrupt Organizations Act"), <u>see</u> 18 U.S.C. § 1962(d); conspiracy to possess and distribute narcotics, <u>see</u> 21 U.S.C. §§ 846, 860(a); use and carry of a firearm in relation to a drug-trafficking crime, <u>see</u> 18 U.S.C. § 924(c)(1)(A); and drive-by shooting, <u>see</u> 18 U.S.C. §§ 36(b)(2)(A), 2 (aiding and abetting) — to list only a few. The testimony of several cooperating witnesses — Luis Yanyoré-Pizarro, Oscar Calviño-Ramos, Luis Delgado-Pabón, and Oscar Calviño-Acevedo (persons indicted with our defendants, but who later pled guilty) — helped seal their fate.

Collectively, our defendants' appeals (now consolidated) raise a battery of issues concerning the sufficiency of the evidence for the RICO-conspiracy, drug-conspiracy, and firearms convictions; the admission of out-of-court statements about a murder-by-choking incident; the correctness of the RICO-conspiracy jury instructions; and the reasonableness of two of the sentences.[1] We address these subjects in that order, filling in the details (like which defendant makes which claims) as we move along.[2] But for anyone wishing to know our ending up front, when all is said and done we *affirm*.

---

[1] Rodríguez-Martínez also argues that his trial attorney rendered ineffective assistance by failing to object to certain jury instructions and to any aspect of the sentencing. He debuts the argument here, however. And the record is not suitably developed for deciding that issue now. So we dismiss this claim, without prejudice to his raising it (if he wishes) in a timely postconviction-relief petition under 28 U.S.C. § 2255. See, e.g., United States v. Tkhilaishvili, 926 F.3d 1, 20 (1st Cir. 2019).

[2] We do have a small speed bump to clear first, however. Rodríguez-Torres, Sánchez-Mora, and Vigio-Aponte try to join some of their coappellants' arguments. There is a mechanism for doing this, see Fed. R. App. P. 28(i), though appellants must "connect the arguments" they wish to "adopt[] with the specific facts pertaining to [them]," see United States v. Bennett, 75 F.3d 40, 49 (1st Cir. 1996) — i.e., they must show "that the arguments" really are "transferable" from their coappellants' case to theirs, see United States v. Ramírez-Rivera, 800 F.3d 1, 11 n.1 (1st Cir. 2015) (quotation marks omitted). We question whether Rodríguez-Torres and Sánchez-Mora did enough to satisfy this standard. But because the arguments are not difference-makers, "we will assume" (without holding) "that each appellant effectively joined in the issues that relate to his situation." United States v. Rivera-Carrasquillo, 933 F.3d 33, 39 n.5 (1st Cir. 2019).

**SUFFICIENCY CLAIMS**

**Overview**

Rodríguez-Torres, Rodríguez-Martínez, Guerrero-Castro, and Sánchez-Mora (but not Vigio-Aponte) claim that the prosecution submitted insufficient evidence to sustain some of their convictions:

- Rodríguez-Torres challenges his RICO- and drug-conspiracy convictions, plus his firearm conviction;

- Rodríguez-Martínez contests his RICO- and drug-conspiracy convictions;

- Guerrero-Castro questions his RICO-conspiracy and firearm convictions; and

- Sánchez-Mora (by adopting his codefendants' arguments that apply to his situation) disputes his RICO- and drug-conspiracy convictions.

And so they fault the judge for denying their motions for judgments of acquittal. We will turn to the specifics of their arguments and the government's counterarguments in a minute. But like the government, we find none of their claims persuasive.

**Analysis**

*Standard of Review*

We assess preserved sufficiency claims *de novo* (with fresh eyes, in plain English), reviewing the evidence, and making all inferences and credibility choices, in the government's favor — reversing only if the defendant shows that no rational factfinder

could have found him guilty.  See, e.g., Ramírez-Rivera, 800 F.3d at 16; United States v. Casas, 356 F.3d 104, 126 (1st Cir. 2004). For convenience, we'll call this the regular sufficiency standard. An unpreserved challenge, contrastingly, requires reversal only if the defendant shows — after viewing the evidence the exact same government-friendly way — that allowing his conviction to stand will work a "clear and gross injustice." See, e.g., United States v. Freitas, 904 F.3d 11, 23 (1st Cir. 2018); United States v. Foley, 783 F.3d 7, 12-13 (1st Cir. 2015) (calling the clear-and-gross injustice metric a "stringent standard" that is "a particularly exacting variant of plain error review").  For easy reference, we'll call this the souped-up sufficiency standard.

Adopting a scorched-earth approach, the parties fight over which standard to apply.  Convinced that they preserved their sufficiency arguments, Rodríguez-Torres, Rodríguez-Martínez, Guerrero-Castro, and Sánchez-Mora argue that we should use the regular sufficiency standard.  Unimpressed by their assertions, the government believes that the quartet "waived" aspects of their arguments and that we must therefore apply the souped-up sufficiency standard to those claims.  But rather than spend time grappling with the intricacies of this issue, we will assume *arguendo* in their favor that they preserved each sufficiency argument.

*RICO-Conspiracy Crime*

RICO makes it a crime "for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of [an] enterprise's affairs through a pattern of racketeering activity" — or to conspire to do so. See 18 U.S.C. § 1962(c), (d). Broadly speaking (we will have more to say on this below), a RICO-conspiracy conviction requires proof that the defendant knowingly joined the conspiracy, agreeing with one or more coconspirators "to further [the] endeavor which, if completed, would satisfy all the elements of a substantive [RICO] offense." Salinas v. United States, 522 U.S. 52, 65 (1997); see also Aetna Cas. Sur. Co. v. P & B Autobody, 43 F.3d 1546, 1562 (1st Cir. 1994).

Rodríguez-Torres, Rodríguez-Martínez, Guerrero-Castro, and Sánchez-Mora offer a litany of reasons why the evidence does not support their RICO-conspiracy convictions. Disagreeing with everything they say, the government thinks that the evidence is just fine. We side with the government.[3]

---

[3] A quick heads-up: in a part of our opinion addressing the defendants' jury-charge complaints, the parties argue over whether the judge properly instructed on the enterprise, interstate-or-foreign-commerce, association, participation, and mental-state elements. Those arguments are not relevant here, however, given how the defendants frame their sufficiency challenges.

### enterprise

Enterprises under RICO include "any union or group of individuals associated in fact although not a legal entity." See United States v. Turkette, 452 U.S. 576, 578 n.2 (1981); see also Ramírez-Rivera, 800 F.3d at 19. Such so-called association-in-fact enterprises may be "proved by evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit." See Turkette, 452 U.S. at 583. The group need not have some decisionmaking framework or mechanism for controlling the members. See Boyle v. United States, 556 U.S. 938, 948 (2009) (holding that a RICO enterprise "need not have a hierarchical structure or a 'chain of command'; decisions may be made on an ad hoc basis and by any number of methods — by majority vote, consensus, a show of strength, etc."). Instead the group must have "[1] a purpose, [2] relationships among those associated with the enterprise, and [3] longevity sufficient to permit these associates to pursue the enterprise's purpose."[4] Id. at 946.

As to [1] — "purpose" — the group must share the "common purpose of engaging in a course of conduct." Id. As to [2] — "relationship" — there must also be evidence of "interpersonal

---

[4] We added the bracketed numbers for ease of discussion.

relationships" calculated to effect that purpose, *i.e.*, evidence that the group members came together to advance "a certain object" or "engag[e] in a course of conduct." Id. (quotation marks omitted). And as to [3] — "longevity" — the group must associate based on its shared purpose for a "sufficient duration to permit an association to 'participate' in [the enterprise's affairs] through 'a pattern of racketeering activity,'" id., though "nothing in RICO exempts an enterprise whose associates engage in spurts of activity punctuated by periods of quiescence," id. at 948. Also and importantly, because RICO's plain terms "encompass '*any* . . . group of individuals associated in fact,' . . . the definition has a wide reach," meaning "the very concept of an association in fact is expansive." Id. at 944 (emphasis added by the Boyle Court).

Measured against these legal standards, the record — visualized most favorably to the government — adequately shows that La Rompe operated as an association-in-fact enterprise.

For starters, the evidence reveals La Rompe's purpose: to get filthy rich by selling drugs at La Rompe-controlled housing projects, using violence (and deadly violence at that) whenever necessary to protect and expand its turf. As cooperator Delgado-Pabón put it, La Rompe's "purpose" was "to make the organization bigger" and "stronger" — "to control all of the housing projects

- 9 -

in the metro area" so that it would be rolling in money. On top of that, the evidence shows the necessary relationships between La Rompe members: associates named their group "La Rompe ONU," reflecting that they saw themselves as a united, organized group of drug traffickers — the "ONU" stands for "Organización de Narcotraficantes Unidos" (in English, "Organization of United Drug Traffickers"); self-identified as La Rompe "members," flashing a hand signal to show their loyalty; got together daily to peddle massive amounts of drugs at La Rompe's many drug points; had meetings to discuss decisions that "[a]ffect[ed] the organization," like whether to kill a traitor or take over a La ONU-controlled housing project (La Rompe and La ONU were archfoes, don't forget), or how to keep the peace among the members; worked together — pooling resources, for example (manpower, guns, and cars, *etc.*) — to boost profits and gain more territory, principally through jointly-undertaken activities like robberies, carjackings, and murders; and followed La Rompe "rules" like their lives were on the line — because they were. And finally, the evidence shows La Rompe continued as a cohesive unit for at least eight years. See Ramírez-Rivera, 800 F.3d at 19 (finding similar evidence "more than" adequate to prove "a RICO enterprise").

Though not necessary thanks to Boyle (which remember held that a RICO enterprise "need not have a hierarchical structure

- 10 -

or a "chain of command'; decisions may be made on an ad hoc basis and by any number of methods — by majority vote, consensus, a show of strength, *etc.*"), the evidence also shows that La Rompe had business-like traits as well.  In addition to its name, meetings, and rules, La Rompe had a loose hierarchical structure.  Josué Vázquez-Carrasquillo was La Rompe's "supreme leader," and Vigo-Aponte was its "second" leader.  Each La Rompe-controlled housing project had a La Rompe-appointed "leader" and drug-point owners, the latter of whom had responsibility over "employees" like enforcers, sellers, runners, and lookouts.  Also much like a business, La Rompe rewarded good performance and loyalty.  In the words of cooperator Calviño-Acevedo, "practically all of us, we worked for the organization like normal employees," growing "within the organization" to the point "we'd be given a drug point."  One way to advance within La Rompe was by being close to the "boss," Vázquez-Carrasquillo.  Another way was by "killing people."  And with these extra structural features, the evidence here far surpasses what <u>Boyle</u> requires for a RICO enterprise.

Rodríguez-Torres, Guerrero-Castro, and Sánchez-Mora resist this conclusion on several grounds.  The government sees no merit in any of them.  Neither do we.

Despite conceding in their appellate briefs that La Rompe was indeed a "drug trafficking *organization*" (emphasis

- 11 -

ours), the trio argues that La Rompe was not an enterprise because (in their telling) the housing-project crews were "independen[t]" entities that did not "coordinat[e]" with each other. The evidence cuts against them, however. According to the record, while there were "different crews," La Rompe "controlled" the housing-project drug points — with "one same boss" (Vázquez-Carrasquillo) at the top. And everyone in the organization — from the supreme leader and his second-in-command, to the housing-project leaders, to the drug-point owners, to the low-level employees — were La Rompe members who (among other things) had to follow the organization's rules or else (with the "or else" ranging all the way from a beating, to death). Unsurprisingly then, La Rompe members often worked together, regardless of crew affiliation. One example is that La Rompe frequently "call[ed] in several enforcers from different groups" when taking over La ONU-controlled housing projects. Another example is that La Rompe sometimes used members from across the organization when carrying out killings. See generally Ramírez-Rivera, 800 F.3d at 19 (holding that, although La ONU came about as a "merging of smaller gangs that still operated their existing drug points," it qualified as a RICO enterprise because (among other things) the groups combined their efforts "to sell drugs, and later, to also stomp out the competition (specifically, La Rompe)").

- 12 -

Not so fast, say Rodríguez-Torres, Guerrero-Castro, and Sánchez-Mora. They contend that crews from different housing projects did not "share . . . resources for purchase of narcotics or firearms," which, they believe, kiboshes any notion that La Rompe was a RICO enterprise. But they ignore Yanyoré-Pizarro's testimony that "La Rompe" committed robberies and carjackings to (among other things) "get the money to maintain drug points that we were acquiring little by little" and to "buy materials, buy weapons, buy ammo, bullets." And they ignore Calviño-Acevedo's testimony to the same effect.[5]

In a somewhat related vein, Rodríguez-Torres, Guerrero-Castro, and Sánchez-Mora insist that La Rompe did not own or have "a cache of firearms." But the testimony shows that La Rompe had "pistols, rifles, AR-15s, AK-47s," which, when "not in the hands of enforcers," the organization stored in various apartments.

---

[5] The trio also blasts the government for not producing evidence of how La Rompe members communicated with or even knew each other. The gaping hole in this argument is that the government can prove a RICO conspiracy without showing that each conspirator "knew all the details or the full extent of the conspiracy, including the identity and role of every other conspirator." Aetna Cas. Sur. Co., 43 F.3d at 1562. Still, the evidence shows that La Rompe members knew each other by nickname or identified each other by hand signal. And a rational jury could reasonably infer that members developed a level of familiarity with each other by, for example, attending organizational meetings or committing countless crimes together. "[A]s [you] grew in the organization," Calviño-Acevedo told the jury, "you learn[ed] . . . who's who and who's not who."

Enforcers could own their own guns. But leaders could take them away if the enforcers did "something wrong." And enforcers also had to lend their guns to other La Rompe members when needed.

Still trying to spin the gun evidence in their favor, the trio claims that La Rompe members would "fight over, steal and even kill each other to get firearms." But the episode they discuss involved a *non*-La Rompe member (known as "Colo") who sold guns to one La Rompe crew who was having an "internal war" with another crew (cooperator Calviño-Acevedo and his colleagues killed Colo, but they also killed a four-year-old boy with a stray bullet). Despite the conflict between the crews, Calviño-Acevedo testified that both crews were still part of La Rompe.

Curiously, Rodríguez-Torres, Guerrero-Castro, and Sánchez-Mora claim that "La Rompe had no economic activity" or "financial organization" and derived no "economic or organizational benefit" from its members' drug dealing. This is curious because making money through drug selling was La Rompe's *raison d'être*. Whether drug sales directly benefited La Rompe is irrelevant, because the sales contributed to La Rompe's goal of enriching its members. And the drug dealing did benefit La Rompe organizationally, because one of La Rompe's main goals was "to control all of the housing projects of the metro area," which required tons of cash. Insofar as the trio means that La Rompe

did not have a bank account or balance sheet, these formalities are not required for an association-in-fact enterprise. See Boyle, 556 U.S. at 948. Regardless, some La Rompe members *did* perform accounting functions — Rodríguez-Torres, for example, "took care of [Vázquez-Carrasquillo's] finances" and helped with Vigo-Aponte's "finances" too.

Taking another tack, the trio claims that La Rompe did not pay Yanyoré-Pizarro and Calviño-Acevedo for their work as enforcers — which, they contend, shows no enterprise existed. But Yanyoré-Pizarro testified that some owners gave him "[c]ars, firearms," and sometimes "cash" for contract killings. And Calviño-Acevedo testified that "the organization" compensated him for killings by giving him "[c]ountless drug points."

As a last gasp, Rodríguez-Torres, Guerrero-Castro, and Sánchez-Mora say that we should see the enterprise issue their way, because no evidence shows that La Rompe had "colors, initiation rites, and a formal hierarchy" or even "trained" its members "in the use of weapons and criminal conduct." This argument is beside the point. When they exist, such features certainly are relevant to the enterprise inquiry. But none is necessary. And the absence of any is not determinative. See Boyle, 556 U.S. at 948; see also United States v. Nascimento, 491 F.3d 25, 33 (1st Cir. 2007). As explained above, however, the

- 15 -

record does show that La Rompe had these or similar features — La Rompe members identified themselves with a hand signal, had a rite of passage (killing to get a drug point), and a loose hierarchical structure.  To this we add that when cooperator Calviño-Acevedo joined La Rompe, a La Rompe leader "explained to [him] how everything was," which disposes of their no-training suggestion.

The bottom line is that the government presented sufficient evidence that La Rompe was an association-in-fact enterprise, despite what the trio thinks.

(ii)
<u>effect on interstate or foreign commerce</u>

Prosecutors had to show La Rompe's interstate- or foreign-commerce effects.  Insisting that "La Rompe did not operate outside of Puerto Rico" and that the "violent actions imputed to La Rompe occurred in Puerto Rico," Rodríguez-Torres, Guerrero-Castro, and Sánchez-Mora contend that "no evidence" shows that La Rompe impacted "interstate commerce" in a RICO sense.  The government disagrees.  And so do we.

La Rompe need only have had a "*de minimis*" effect on interstate or foreign commerce, <u>see</u> <u>Ramírez-Rivera</u>, 800 F.3d at 19 — which is a fancy way of saying that "RICO requires no more than a slight effect upon interstate commerce," <u>see</u> <u>United States</u> v. <u>Doherty</u>, 867 F.2d 47, 68 (1st Cir. 1989).  And viewed in the proper light — afresh and in a way most pleasing to the prosecution — the

- 16 -

record shows that La Rompe's many drug points ran daily (some on a 24-hour, 7-day-a-week basis), selling endless amounts of cocaine, heroin, and marijuana, to name just some of the narcotics dealt there. A government expert testified that cocaine and heroin are not produced in Puerto Rico, and so must be imported from South American countries like Colombia. He also testified that marijuana is not produced in Puerto Rico (except for the hydroponic form, which is "very limited"), and so must be imported from states like Arizona, California, and Texas. Cooperator Yanyoré-Pizarro testified that a La Rompe leader called "Pekeko" imported "marijuana pounds" from Texas. And cooperator Calviño-Acevedo testified that he supplied La Rompe with "pounds of marijuana" that he got "through the mail."

All of this evidence shows that La Rompe's activities affected not only foreign commerce, but also interstate commerce. See Ramírez-Rivera, 800 F.3d at 19-20.

(iii)
participation

Prosecutors also had to prove that the defendants had "some part in directing" La Rompe's affairs — *i.e.*, that they participated in the "operation or management" of the enterprise itself. See id. at 20 (relying in part on Reves v. Ernst & Young, 507 U.S. 170, 179, 183 (1993), in assessing the evidentiary sufficiency of the government's RICO-conspiracy case); see also

- 17 -

Reves, 507 U.S. at 184-85 (explaining that persons who participate in the operation or management of the enterprise's affairs will, of course, necessarily meet the RICO statute's requirement that he be "associated with" the enterprise).  "An enterprise is 'operated' not just by upper management but also by lower rung participants in the enterprise who are under the direction of upper management."  Reves, 507 U.S. at 184.

Calling the government's participation evidence too skimpy, Rodríguez-Torres, Rodríguez-Martínez, Guerrero-Castro, and Sánchez-Mora variously argue that "there was no testimony" that they were "leader[s]" or that they "participated in decision making events" — in their view of things, they were "merely present" when key events went down.  As the government notes, we must take all evidence and draw all reasonable inferences in the prosecution's favor — not theirs.  And having done so, we see plenty of evidence pegging them as drug-point owners:  Rodríguez-Torres owned a marijuana drug point in the La Rompe-controlled housing project of Covadonga; Rodríguez-Martínez owned a heroin drug point in the La Rompe-controlled housing project of Monte Hatillo; Guerrero-Castro owned a marijuana drug point in the La Rompe-controlled housing project of Los Laureles; and Sánchez-Mora owned a heroin drug point in the La Rompe-controlled housing project of Covadonga.  Which is important because drug-point owners

played a critical role in achieving La Rompe's goal of "control[ling] all of the housing projects of the metro area" to generate "more money" so La Rompe could "grow and have more power."

As in Ramírez-Rivera, these facts easily satisfy the participation element. See 800 F.3d at 20 (holding that drug-point ownership met the operation-or-management test).[6]

### (iv)
### pattern of racketeering

A pattern of racketeering activity requires at least two predicate acts of racketeering within ten years of each other. See 18 U.S.C. § 1961(5); United States v. Tavares, 844 F.3d 46, 54 (1st Cir. 2016). Predicate acts include murder and drug dealing, as well as aiding and abetting such acts. See Ramírez-Rivera, 800

---

[6] Citing out-of-circuit law — United States v. Wilson, 605 F.3d 985 (D.C. Cir. 2010), and Smith v. Berg, 247 F.3d 532 (3d Cir. 2001) — the government suggests (first quoting Wilson, then quoting Smith, adding its own emphasis) that "[l]iability for a RICO-conspiracy offense . . . requires only that the defendant has 'knowingly agree[d] to facilitate a scheme which *includes* the operation or management of a RICO enterprise'" and that under the RICO-conspiracy statute, "the defendant need not '*himself* participate in the operation or management of an enterprise.'" The evidence in our Ramírez-Rivera case showed that the challenging defendants actually played a part in directing the enterprise's affairs, given their drug-point-owner status — which necessarily showed that they agreed to a scheme that included such participation. So too here. Which is why we need not decide whether to adopt the Wilson/Smith approach in this case, thus leaving that issue for another day. See generally PDK Labs., Inc. v. DEA, 362 F.3d 786, 799 (D.C. Cir. 2004) (Roberts, J., concurring in part and concurring in the judgment) (noting that "if it is not necessary to decide more, it is necessary not to decide more").

F.3d at 20 (citing 18 U.S.C. § 1961(1)).  The acts must be "related" and "amount to or pose a threat of continued criminal activity." H.J. Inc. v. Nw. Bell Tel. Co., 492 U.S. 229, 239 (1989).  A RICO-conspiracy defendant, however, need not have personally committed — or even agreed to personally commit — the predicates.  See Salinas, 522 U.S. at 63; United States v. Cianci, 378 F.3d 71, 90 (1st Cir. 2004).   All the government need show is that the defendant agreed to facilitate a scheme in which a conspirator would commit at least two predicate acts, if the substantive crime occurred.  See, e.g., Salinas, 522 U.S. at 64-65; Cianci, 378 F.3d at 90.

Without citing to the record, Rodríguez-Torres, Guerrero-Castro, and Sánchez-Mora claim that cooperators offered "discredit[able]" testimony because they (the cooperators) "could not" provide dates and times for some events — and thus, the thesis runs, the government did not prove the pattern-of-racketeering element.   But again, and as the government stresses, we must inspect the record in the light most flattering to the government's theory of the case, resolving all credibility issues and drawing all justifiable inferences in favor of the jury's guilty verdicts — which undercuts any credibility-based argument.

Rodríguez-Torres, Guerrero-Castro, and Sánchez-Mora also suggest that "while the first predicate act may be the drug

trafficking imputed to [them], there is simply no additional evidence to establish another predicate act as required by the RICO statute." To the extent they suggest that the two predicate acts must be of *different* types, they are wrong. See generally Boyle, 556 U.S. at 948 (noting that "a group that does nothing but engage in extortion through old-fashioned, unsophisticated, and brutal means may fall squarely within [RICO's] reach"); Fleet Credit Corp. v. Sion, 893 F.2d 441, 444-48 (1st Cir. 1990) (holding that multiple acts of "mail fraud" can satisfy the pattern-of-racketeering requirement, provided they amount to — or constitute a threat of — continuing criminal activity). Nevertheless, and as the government is quick to point out, the evidence shows that La Rompe members — including drug-point owners (which all three were) — committed or aided and abetted scads of drug deals (the government estimated that La Rompe sold thousands of kilograms each of marijuana, cocaine, crack cocaine, and heroin), plus scores of murders (drug-point owners, for instance, used "enforcers" to "kill[] people").[7] These acts were related to each other (they

---

[7] Sticking with murder for just a bit, we note that cooperator Yanyoré-Pizarro fingered Rodríguez-Torres as a participant in the drive-by killing of a La Rompe leader who had "turned" on the organization (a killing we discuss in the sentencing section of this opinion). And cooperator Calviño-Acevedo said that Guerrero-Castro "kill[ed] people" for La Rompe too.

- 21 -

were La Rompe's business, after all), occurred over a lengthy period (at least eight years) and, at a minimum, threatened to keep on going (the trio makes no convincing argument to the contrary).

All in all, the government offered enough evidence of a racketeering pattern.

(v)
### knowingly joined

Each RICO-conspiracy defendant must have knowingly joined the conspiracy. See, e.g., Aetna Cas. Sur. Co., 43 F.3d at 1562. And "[a]ll that is necessary to prove" this RICO-conspiracy element is to show "that the defendant agreed with one or more co-conspirators to participate in the conspiracy." See Ramírez-Rivera, 800 F.3d at 18 n.11 (quotation marks omitted). Rodríguez-Torres, Rodríguez-Martínez, Guerrero-Castro, and Sánchez-Mora think that the government's evidence falls short of satisfying that element, because, the argument goes, they were at most merely present (which is all they'll cop to) at the scene of conspiratorial deeds. But we agree with the government that a rational jury could infer their knowing agreement to conspire from their actual participation as drug-point owners. See id. Making money through drug dealing was a key object of the conspiracy. And a reasonable jury could conclude that their drug-point ownership was intended to — and actually did — accomplish that

- 22 -

object.  See id. (finding the knowledge element met by similar evidence).

So the government presented ample evidence on this element as well.

*Drug-Conspiracy Crime*

Moving on from the RICO-conspiracy crime, Rodríguez-Torres, Rodríguez-Martínez, and Sánchez-Mora protest that the government provided insufficient evidence that they knowingly joined the drug conspiracy.  Not so, says the government.  As for us, we agree with the government that their challenges necessarily fizzle because (as just indicated) adequate evidence showed that they knowingly joined the RICO conspiracy, of which the drug conspiracy was an integral part.

*Firearms Crime*

Federal law punishes persons for using or carrying a gun "during and in relation to any . . . drug trafficking crime" or possessing a gun "in furtherance of any such crime."  18 U.S.C. § 924(c)(1)(A); see also United States v. Gonsalves, 859 F.3d 95, 111 (1st Cir. 2017) (explaining that to secure a conviction under the statute, the government must show that the defendant "(1) possessed a firearm (2) in furtherance of (3) a drug-trafficking crime").  To satisfy the in-furtherance requirement, the government must establish "a sufficient nexus between the

- 23 -

firearm and the drug crime such that the firearm advances or promotes the drug crime." United States v. Gurka, 605 F.3d 40, 44 (1st Cir. 2010) (quotation marks omitted).

Rodríguez-Torres and Guerrero-Castro insist that the prosecution put forward no evidence showing that they used or carried a firearm in furtherance of drug trafficking. Ergo, their argument continues, the judge should have entered verdicts of acquittal on the firearm charge. The government, for its part, believes the opposite is true. And we, for our part, again side with the government.

Cooperator Delgado-Pabón testified that Rodríguez-Torres owned drug points in housing projects that La Rompe controlled. He testified too that Rodríguez-Torres served as an armed enforcer, carrying a .10 caliber Glock — among other duties, an enforcer "intimidat[ed]" and "kill[ed]" people for the organization. Anyway, cooperator Calviño-Acevedo added that Rodríguez-Torres supplied guns to La Rompe and kept a .40 caliber Glock at his (Rodríguez-Torres's) house, where he "decked" marijuana ("decked" is slang for prepared for distribution). Shifting from Rodríguez-Torres, Delgado-Pabón testified that he saw an always-armed Guerrero-Castro at a La Rompe-controlled drug point, pretty much daily at one point. Add to this the large amount of evidence showing that La Rompe's aim was to defend its

drug turf, with violence if necessary, and we conclude that a rational jury could easily find that the guns Rodríguez-Torres and Calviño-Acevedo carried, and the guns Rodríguez-Torres gave to La Rompe, "advance[d] or promote[d]" their own and their coconspirators' drug-dealing business. See Gurka, 605 F.3d at 44; see also Ramírez-Rivera, 800 F.3d at 23 (reaching a similar conclusion in a similar case involving similar evidence).

Rodríguez-Torres's and Guerrero-Castro's counterarguments do not do the trick either. Rodríguez-Torres, for example, seemingly questions Delgado-Pabón's and Calviño-Acevedo's credibility, calling their testimony occasionally contradictory and uncorroborated. What he overlooks is that we must draw all inferences — including inferences about credibility — in favor of the jury's verdict. So to the extent that his counterargument turns on showing Delgado-Pabón and Calviño-Acevedo were not credible — an issue the jury resolved against them — it fails. Also damaging to him is that our sufficiency cases say that "[t]estimony from just one witness can support a conviction." United States v. Negrón-Sostre, 790 F.3d 295, 307 (1st Cir. 2015) (quotation marks omitted). As for Guerrero-Castro, he contends that Delgado-Pabón did not describe "the type" of gun he (Guerrero-Castro) carried at the drug points. But no such evidence was needed. See Ramírez-Rivera, 800 F.3d at 23. Still searching for

- 25 -

a game-changing theory, he speculates that maybe he had a "[r]eplica" gun. A problem for him is that he approaches the record the wrong way — for after drawing all plausible inferences in favor of the verdict (something he does not do), we think a reasonable jury could infer from the evidence (*e.g.*, that he was an "always armed" drug-point owner who "would kill") that he possessed a firearm as defined in the criminal code. See 18 U.S.C. 921(a)(3) (explaining that "firearm" in § 924(c) means a weapon "which will or is designed to or may readily be converted to expel a projectile by the action of an explosive").[8]

## Wrap Up

Sufficiency challenges are notoriously difficult to win, given the standard of review. See, e.g., United States v. Tum, 707 F.3d 68, 69 (1st Cir. 2013). And having spied no winning argument here, we press on.

## OUT-OF-COURT-STATEMENTS CLAIMS

## Overview

Guerrero-Castro argues that the judge slipped by admitting two out-of-court statements allegedly made by him — one

---

[8] The indictment also charged the duo with aiding and abetting the possession of a firearm in relation to a drug-trafficking conspiracy. And Rodríguez-Torres claims the evidence inadequately supported that theory. But because the evidence sufficed to convict him as a principal, we need not address that facet of his sufficiency claim.

- 26 -

to cooperator Calviño-Ramos, the other to cooperator Calviño-Acevedo. Both statements indicated that Guerrero-Castro had choked a La ONU member to death. As he sees it, the government violated federal Criminal Rule 12 by not notifying him of its plan to use these statements at trial.[9] Disagreeing, the government asserts that Guerrero-Castro "waived" any problem he had with the admission of Calviño-Ramos's testimony by not raising it below. Waiver aside, the government sees no error because Guerrero-Castro made that statement before Calviño-Ramos became a government cooperator and so was not discoverable under Rule 12. As for the statement to Calviño-Acevedo, the government relevantly contends that Guerrero-Castro cannot show prejudice, because the jury had already heard Calviño-Ramos's testimony. In the pages that follow,

_____

[9] Rule 12(b)(4)(B) provides that

[a]t the arraignment or as soon afterward as practicable, the defendant may, in order to have an opportunity to move to suppress evidence under Rule 12(b)(3)(C), request notice of the government's intent to use (in its evidence-in-chief at trial) any evidence that the defendant may be entitled to discover under Rule 16.

And federal Criminal Rule 16(a)(1)(A) says that

[u]pon a defendant's request, the government must disclose to the defendant the substance of any relevant oral statement made by the defendant, before or after arrest, in response to interrogation by a person the defendant knew was a government agent if the government intends to use the statement at trial.

we explain why the government has the better of the argument — but first, some context.

A couple of weeks before trial, Guerrero-Castro asked the judge to have prosecutors disclose pretrial all statements he was entitled to under federal Criminal Rule 16(a)(1)(A) — a provision (we note again) that makes discoverable "the substance of any relevant oral statement made by the defendant, before or after arrest, in response to interrogation by a person the defendant knew was a government agent if the government intends to use the statement at trial." Guerrero-Castro wanted to know if prosecutors planned to "rely on any such statements" so he could decide if he should move to suppress them. The judge issued a minute order granting Guerrero-Castro's "Rule 16" motion. A few days later, complying with a previous order requiring early disclosure of witness statements covered by the Jencks Act, 18 U.S.C. § 3500, the government handed the defense "4,000 pages" of materials relating to cooperators Yanyoré-Pizarro, Delgado-Pabón, Calviño-Ramos, and Calviño-Acevedo.[10]

At trial, Calviño-*Ramos* testified that Guerrero-Castro got a drug point at "Los Laureles" by "kill[ing]" for La Rompe.

---

[10] The Jencks Act is named after <u>Jencks</u> v. <u>United States</u>, 353 U.S. 657 (1957). <u>See</u> <u>United States</u> v. <u>Acosta-Colón</u>, 741 F.3d 179, 189 n.1 (1st Cir. 2013).

- 28 -

Asked how he knew this, Calviño-Ramos testified (over leading-question and asked-and-answered objections by the defense) that Guerrero-Castro, "Bin La[den]," "Bryan Naris," and "Kiki Naranja" told him in "Los Laureles" that Guerrero-Castro had choked a La ONU member to death. At a bench conference after Calviño-Ramos's testimony, Guerrero-Castro's counsel raised a "Jencks" concern, saying he needed any Jencks statements about the choking incident for cross-examination purposes. No such statements existed, the prosecutor told the judge. The prosecutor added that the government had disclosed in pretrial plea negotiations that it would put on evidence that Guerrero-Castro had committed a choking murder. And after the judge said "[l]et's proceed with cross," Guerrero-Castro's lawyer said that he had "no issue then."

Several days later, Calviño-*Acevedo* testified that Guerrero-Castro "is known as a person who grabs people by the neck and chokes them." Asked how he knew this, Calviño-Acevedo said that Guerrero-Castro "confessed . . . one time" when "we were at MDC" Guaynabo, a federal prison in Guaynabo, Puerto Rico. Guerrero-Castro's counsel objected. And another bench conference took place. Guerrero-Castro's lawyer noted that "[t]he government informed me of the statement that you heard." But he said that the government had not given "written notice" that it intended to introduce the statement as "a confession." Responding to questions

- 29 -

from the judge, the prosecutor said that Guerrero-Castro's counsel knew from "several proffer sessions that evidence would come out that his client would choke people, that our cooperating witnesses would say in open court under oath that his client would choke people, so he knew this was coming." Asked by the judge if the government had told the defense that "this evidence was coming out today?" the prosecutor responded (without contradiction from defense counsel) that he had. The prosecutor also said that Calviño-Acevedo's comment involved the same choking incident that Calviño-Ramos had testified to. Finding that the government had given the defense "plenty of notice" and that Calviño-Acevedo would simply be "confirming what [Calviño-Ramos] said," the judge overruled the objection.

Now on to our take.

## Analysis

### *Standard of Review*

Abuse-of-discretion review applies to preserved claims that the judge should not have admitted evidence because the government infracted Rule 12. See, e.g., United States v. Marrero-Ortiz, 160 F.3d 768, 774 (1st Cir. 1998). The parties, however, disagree on whether Guerrero-Castro properly preserved all his arguments here. Guerrero-Castro says he did. The government says he is only half right, insisting that he waived or forfeited his

- 30 -

arguments about Calviño-Ramos's testimony but agreeing that he preserved his arguments about Calviño-Acevedo's testimony. We bypass any concerns about waiver or forfeiture, because his challenge fails regardless.

*Statement to Calviño-Ramos*

Rule 12(b)(4)(B) applies to evidence that is "discoverable under Rule 16." United States v. de la Cruz-Paulino, 61 F.3d 986, 993 (1st Cir. 1995). To be discoverable under Rule 16, the statement had to have been made to a government agent. Fed. R. Crim. P. 16(a)(1)(A). But Guerrero-Castro offers no Rule 16-based argument — *i.e.*, that he made the statement "in response to interrogation by a person [he] knew was a government agent." And that is probably because — as the government notes, without being contradicted (Guerrero-Castro filed no reply brief) — Guerrero-Castro made the statement to Calviño-Ramos *before* Calviño-Ramos became a government cooperator. See generally United States v. Taylor, 417 F.3d 1176, 1181 (11th Cir. 2005) (spying no abused discretion "in admitting" the challenged testimony because the defendant "made . . . voluntary statements to an individual who was not a government agent" — thus "the statements are . . . not discoverable under" Rule 16(a)(1)(A)).

*Statement to Calviño-Acevedo*

We can also make quick work of Guerrero-Castro's challenge to Calviño-Acevedo's testimony. That is because even if Guerrero-Castro could show a Rule 12 violation (and we intimate no hint of a suggestion that he could), he cannot show prejudice, because the jury had already heard Calviño-Ramos's testimony to the same effect. See generally de la Cruz-Paulino, 61 F.3d at 993 (noting that to get a reversal for a Rule 12 violation, "[a] defendant must prove that the alleged violation prejudiced his case" (quotation marks omitted and brackets in original)). And despite hearing both Calviño-Ramos and Calviño-Acevedo testify about the choking admission, the jury found Guerrero-Castro not guilty of two murder counts — this fact is significant, because a "discriminating verdict . . . tends to" undercut an "assertion of prejudice." United States v. Tashjian, 660 F.2d 829, 836 (1st Cir. 1981); accord United States v. Boylan, 898 F.2d 230, 246 (1st Cir. 1990).

**Wrap Up**

Guerrero-Castro's Rule 12 complaint is not the stuff of reversible error.

## JURY-INSTRUCTION CLAIMS

### Overview

Each defendant challenges various parts of the judge's general RICO-conspiracy instructions.[11]  Here is what you need to know.

After the government concluded its case-in-chief, the judge excused the jury and handed counsel a "draft" of the proposed jury instructions so that they could "take [the draft] with" them that night.  The judge warned them to "be prepared to do closings" the following day.

The next morning, the judge discussed with counsel a few tweaks he made to the draft instructions (adding, for example, conspiracy-withdrawal and multiple-conspiracy instructions).  The defendants completed their cases that morning (Rodríguez-Martínez's mother took the stand, for instance) and then rested. Before breaking for lunch at 12:45 p.m., the judge distributed the revised instructions.

---

[11] To save the reader from having to flip back a few pages, we repeat that RICO forbids "person[s] employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of [that] enterprise's affairs through a pattern of racketeering activity" — or to conspire to do so.  See 18 U.S.C. § 1962(c), (d).

At around 2:00 p.m., the court came back into session. The government, Guerrero-Castro, and Vigio-Aponte gave their closing arguments. And Rodríguez-Martínez started his. After excusing the jury for the evening, the judge asked counsel if they had "[a]ny questions about the instructions." Speaking first, Guerrero-Castro's lawyer said that he had "reviewed" the draft instructions, "checked some cases," and made written "notes" about "questions or suggestions." He then asked for a couple of changes. But concerning the RICO instructions, he only objected to what the parties (and we) call the "essence of a RICO conspiracy" charge (representing the judge's summary of RICO law), arguing that "it's repetitive, because the elements have been discussed in detail in the prior instructions" and that it unduly "simplifie[s] . . . the elements that have to be proven beyond a reasonable doubt." Sánchez-Mora's counsel joined in that objection. Counsel for Rodríguez-Torres, Rodríguez-Martínez, and Vigio-Aponte raised no objections to the RICO-conspiracy instructions. The judge declined to eliminate the essence-of-a-RICO-conspiracy charge.

The following day, after the remaining defendants' closing arguments and the government's rebuttal, the judge charged the jury. On the RICO-conspiracy count, the judge said that to establish guilt, "the government must prove that each defendant knowingly agreed that a conspirator, which may include the

defendant himself, would commit a violation of . . . 18 U.S.[C. §] 1962(c), which is commonly referred to as the substantive RICO [s]tatute."  After quoting § 1962(c), the judge stated (emphasis ours) that the government must prove five elements beyond a reasonable doubt:

> First, that an enterprise existed or that [an] enterprise *would* exist.  Second, that the enterprise was or *would* be engaged in or its activities [a]ffected or *would* [a]ffect interstate or foreign commerce. . . . Third, that a conspirator was or *would* be employed or associated with the enterprise.  Fourth, that a conspirator did or *would* conduct or participate in — either directly or indirectly — the conduct of the affairs of the enterprise.  And, fifth, that a conspirator did or *would* knowingly participate in the conduct of the affairs of the enterprise through a pattern of racketeering activity as described in the Indictment.  That is, a conspirator did or *would* commit at least two acts of racketeering activity.

The judge then said a little bit about each element.  For example, and as relevant here, the judge said (emphasis ours) that "racketeering activity" includes "drug trafficking, robbery, murder, carjacking, and *illegal use of firearms*, among many others."  And then the judge gave the essence-of-a-RICO-conspiracy charge (again, emphasis ours):

> [B]ecause the essence of a RICO conspiracy offense is the agreement to commit a substantive RICO offense, the government need only prove beyond a reasonable doubt that if the conspiracy offense was completed as contemplated, the enterprise *would* exist, that this enterprise *would* engage in or its activities *would* [a]ffect interstate or foreign commerce[,] [a]nd that a conspirator, who could be but need not be the defendant himself, *would* have been employed by or associated with

- 35 -

the enterprise through a pattern of racketeering activity.

The government is not required to prove that the alleged enterprise was actually established; that the defendant was actually employed by or associated with the enterprise; or that the enterprise was actually engaged in or its activities actually [a]ffected interstate or foreign commerce.

Wrapping up, the judge explained what the government had to establish to show that a defendant "entered into the required conspiratorial agreement" — namely, "that the conspiracy existed and that the defendant knowingly participated in the conspiracy with the intent to accomplish [its] objectives or assist other conspirators in accomplishing [its] objectives," with knowingly "mean[ing] that something was done voluntarily and intentionally, and not because of a mistake, accident or other innocent reason."

After completing the charge, the judge gave the lawyers a chance to object at sidebar. Only Guerrero-Castro's attorney objected to the RICO-conspiracy instructions, repeating his claim that the essence-of-a-RICO-conspiracy charge "oversimplifies the elements of the offense."

With this background in place, we flesh out the parties' claims.

Our defendants argue — in various combinations — that the judge gave improper and confusing RICO-conspiracy instructions

(in delivering both the long version and the essence-of-a-RICO-conspiracy charge) by

> (1) not requiring findings that (a) the enterprise actually existed; (b) the enterprise actually affected interstate or foreign commerce; (c) the defendant actually was employed or associated with the enterprise; and (d) the defendant actually participated in the conduct of the enterprise's affairs;
>
> (2) not saying that a defendant must have "knowingly joined" the RICO conspiracy; and
>
> (3) stating that a firearms crime constitutes racketeering activity.

For ease of reference, we will call these — perhaps somewhat unimaginatively — argument (1), argument (2), and argument (3).

Anyhow, their argument (1) theory is that the judge's repeated use of "would" — that "the enterprise *would* exist," that the enterprise's "activities *would* [a]ffect interstate or foreign commerce," *etc.* (emphasis ours) — clashes with Ramírez-Rivera, where we said that a RICO-conspiracy conviction requires that the government establish

> the existence of an enterprise affecting interstate [or foreign] commerce[;] . . . that the defendant knowingly joined the conspiracy to participate in the conduct of the affairs of the enterprise[;] . . . that the defendant participated in the conduct of the affairs of the enterprise[;] and . . . that the defendant did so through a pattern of racketeering activity by agreeing to commit, or in fact committing, two or more predicate offenses.

800 F.3d at 18 (alteration in original) (quoting United States v. Shifman, 124 F.3d 31, 35 (1st Cir. 1997)). Their argument

- 37 -

(2) claim is that given cases like Ramírez-Rivera, the judge had to — but did not — tell jurors that to convict on a RICO-conspiracy charge, they must find that each defendant knowingly joined the conspiracy. And their argument (3) contention relies on United States v. Latorre-Cacho, where we held that a judge erred by instructing the jury that "'firearms' constitute 'racketeering activity'" — the rationale being that "the commission of firearms offenses, or even the involvement with firearms," is not included in the statutory definition of "racketeering activity." 874 F.3d 299, 301, 302 (1st Cir. 2017).

Responding to argument (1), the government claims that the judge correctly and clearly instructed the jury on the enterprise, interstate-commerce, association, and participation elements of the RICO-conspiracy crime. "[T]his [c]ourt," writes the government, "has not decided whether" RICO conspiracy "requires proof of an existing enterprise; and the Supreme Court, though describing the nature of a RICO conspiracy in terms that foreclose such a requirement, has not explicitly decided the question" either — "[t]he same is true" of the other contested elements, the government adds. So in the government's view (based mainly on its reading of the tea leaves in the United States Report), the prosecution can satisfy "its burden by proving that the conspirators agreed to *form* an enterprise" — which, the

government argues, undercuts the defendants' "interstate-commerce, association, and participation" arguments as well. As for Ramírez-Rivera, the government calls the passage excerpted above — requiring "the existence of an enterprise," for instance — "dicta," because prosecutors there, "like th[e] one[s]" here, "relied on evidence of an *actual* racketeering enterprise to prove the agreement that one would be established, and no argument was raised [there] that the existence of an enterprise was not a necessary element" of a RICO-conspiracy offense.

As for argument (2), the government insists that the judge's instructions — *e.g.*, "that the conspiracy existed and that the defendant knowingly participated in the conspiracy with the intent to accomplish [its] objectives or assist other conspirators in accomplishing [its] objectives" — made clear that the defendants had to have knowingly joined the conspiracy. Which means that the government believes the judge gave error-free instructions on these matters — though the government does argue that even if the judge did err, the defendants still lose, because they cannot show "prejudice" or "a miscarriage of justice."

Moving to argument (3), the government admits that, given Latorre-Cacho, the judge did err in telling the jury that a firearms crime is a racketeering activity for RICO-conspiracy purposes. But, the government assures us, we need not reverse on

this issue, because no challenging defendant can show "prejudice []or a miscarriage of justice," given the "strength of the . . . evidence of more than two qualifying predicate acts."

Time for us to explain why no reversal is called for here.

## **Analysis**

### *Standard of Review*

Conceding that they did not preserve their jury-instruction arguments, Rodríguez-Torres, Sánchez-Mora, Rodríguez-Martínez, and Vigio-Aponte admit that they now must satisfy the demanding plain-error standard, showing not just error but error that is obvious, that is prejudicial (meaning it affected the proceeding's outcome), and that if not fixed by us (exercising our discretion) would cause a miscarriage of justice or undermine confidence in the judicial system. See, e.g., Rivera-Carrasquillo, 933 F.3d at 48 n.14.

Desperate to escape plain-error review, Guerrero-Castro says that he did object to the judge's essence-of-a-RICO-conspiracy charge. True, but that does not help him. His arguments below (that the essence charge was repetitive of the previous instructions that stated "the elements" and was also too simplified to boot) are different from his arguments here (that the instructions did not accurately define the RICO elements, for

- 40 -

the reasons described in arguments (1) and (2), above — a/k/a, the "would"-related-instruction and the knowledge-instruction claims). And our caselaw says that a timely objection on one ground does not preserve an objection on a different ground. See United States v. Glenn, 828 F.2d 855, 862 (1st Cir. 1987).

Undaunted, Guerrero-Castro claims that he should get a pass because the judge conferenced with counsel on the instructions after the first day of closing arguments, which (supposedly) gave his attorney "no time to properly prepare and provide the [judge] more detailed objections." Call us unconvinced. Not only does he cite us no authority to support his free-pass proposition, but the record refutes his no-time assertion. The judge gave counsel the proposed instructions two days before he charged the jury; over those two days, the judge had several discussions with counsel about the instructions, including one in which Guerrero-Castro's lawyer acknowledged that he had reviewed and researched the instructions and asked for some changes; and the judge held a sidebar with counsel after delivering the charge, during which Guerrero-Castro's counsel objected to the essence-of-a-RICO-conspiracy charge, but, again, not on the grounds raised here. See United States v. Henry, 848 F.3d 1, 13-14 (1st Cir. 2017) (finding an instructional claim not preserved because counsel did not raise it at the post-charge sidebar).

The net result is that we apply plain-error review to these challenges, knowing too that unpreserved claims of error like these "*rare*[*ly*]" survive plain-error analysis. See Henderson v. Kibbe, 431 U.S. 145, 154 (1977) (emphasis added); accord United States v. Gómez, 255 F.3d 31, 37 (1st Cir. 2001) (stressing that "the plain-error exception is cold comfort to most defendants pursuing claims of instructional error"); United States v. Paniagua-Ramos, 251 F.3d 242, 246 (1st Cir. 2001) (noting that "the plain error hurdle, high in all events, nowhere looms larger than in the context of alleged instructional errors").

*Argument (1)*

Even assuming (without deciding) that the judge's "would"-related instructions — that "the enterprise *would* exist," that the enterprise's "activities *would* [a]ffect interstate or foreign commerce," *etc.* (emphasis added) — amount to an error that is also obvious (and to be perfectly clear, we intimate no judgment on those questions), we conclude that the defendants fail to establish prejudice or a miscarriage of justice.[12]

If an instruction leaves out an offense element, that "alone is *insufficient* to demonstrate prejudice." United States

---

[12] This is as good a place as any to say a few words about the parties' views on Ramírez-Rivera. As noted, the defendants read Ramírez-Rivera as holding that prosecutors in a RICO-conspiracy case must prove that the enterprise actually existed, that the defendant was actually employed by or associated with the

v. <u>Hebshie</u>, 549 F.3d 30, 44 (1st Cir. 2008) (emphasis added).[13] Rather, a defendant "must satisfy the difficult standard of showing a likely effect on the outcome or verdict." <u>Id.</u> (quotation marks omitted). And this our defendants have not done.

The government charged an actual enterprise. And prosecutors presented that theory to the jury in its opening statement, closing summation, and rebuttal argument. "Power, money, control," the prosecution's opening statement began. "The means[:] drug trafficking, robberies, carjackings, shootings, violence, murder" — "[t]hat was the business of La Rompe . . ., and that is what this case is about." In its closing, the

_____

enterprise, that the enterprise's activities actually affected interstate or foreign commerce, and that the defendant actually participated in the enterprise's affairs. But as the government correctly states, <u>Ramírez-Rivera</u> did not have to confront that issue, because prosecutors there relied on evidence of the enterprise's actual existence, the defendant's actual employment or association with the enterprise, *etc.*, to prove the RICO-conspiracy charge. <u>See</u> 800 F.3d at 18-21. As the government also correctly states, no binding precedent exists on this issue. And we need not stake out a position on these points today, because (as we explain in the text) the defendants lose on plain-error review even if their view is correct (and we, of course, whisper no hint that it is). <u>See generally</u> <u>United States</u> v. <u>Caraballo-Rodríguez</u>, 480 F.3d 62, 70 (1st Cir. 2007) (explaining that a holding that a party "has not met his burden of showing there was an error which was plain" is not a "ruling on the merits").

[13] As the government explains, the assumed errors here are perhaps better described as "misdescription[s] of . . . element[s]" rather than omissions. <u>See</u> <u>Johnson</u> v. <u>United States</u>, 520 U.S. 461, 469 (1997). But the defendants offer no reason (and we see none) for why this distinction should matter for our analysis.

prosecution stressed that "La Rompe was a violent gang that controlled the drug trafficking activities in more than 18 areas, including housing projects and wards within the Municipalit[ies] of San Juan, Carolina, and Trujillo Alto," with its "enem[y]" being "La ONU." The prosecution also called La Rompe "[a]n organization that killed" in its rebuttal — "[a]n organization that [killed] to become more powerful[,] [f]or control, power, money."

And the government presented overwhelming evidence (which we spotlighted pages ago) to back up its theory. For example, the evidence showed that La Rompe actually existed as an enterprise, given how associates: self-identified as La Rompe members; had meetings to discuss matters that affected La Rompe; shared resources, including manpower, guns, and cars; got together every day to peddle monstrous amounts of drugs at La Rompe's many drug points; committed robberies, carjackings, and murder in La Rompe's name; and had to follow strict rules of conduct, on pain of death. The evidence also showed that La Rompe's actions had at least a *de minimis* effect on interstate or foreign commerce, seeing how (among other things) La Rompe imported cocaine and heroin from South America. As for participation, the evidence showed that the defendants owned drug points in La Rompe-controlled housing projects. And on the pattern-of-racketeering question, the evidence showed that La Rompe members — leaders, drug-point owners,

runners, and sellers, *etc.* — actually committed (or aided and abetted the commission of) countless drug sales and scores of murders, all to advance the enterprise's ghastly business.

In their presentations to the jury, even defense counsel did not dispute that La Rompe existed, affected interstate or foreign commerce, and conducted its affairs through drug-trafficking and murder. For example, Vigio-Aponte's counsel predicted in her opening statement that the evidence would show that some of Yanyoré-Pizarro's murders were (emphasis ours) "related to the La Rompe . . . *organization*." In his closing argument, Guerrero-Castro's attorney called La Rompe "a clan of killers" that operated through "a whole bunch of leaders . . .[,] runners, and sellers, and drug point owners." Vigo-Aponte's lawyer admitted in her closing that La Rompe had "area[s]." Rodríguez-Martínez's attorney conceded in his closing that his client's cousin was a La Rompe member (implicitly acknowledging that La Rompe does exist). And summarizing — without contesting — the cooperators' testimony about how La Rompe's drug operation worked, Sánchez-Mora's counsel noted in his closing that

> [t]here are leaders in different housing projects, and . . . these leaders appoint people to become drug point owner[s]. . . . [T]he person that becomes a drug point owner has basically proven [his] worth to the organization, and that's by killing someone. The person that kills on behalf of the organization, proves . . . [his] loyalty.

No surprise, then, that defendants cannot show that the "would"-related instructions — that "the enterprise *would* exist," that the enterprise's "activities *would* [a]ffect interstate or foreign commerce," *etc.* (emphasis added, and apologies for the repetition) — prejudiced them or caused a miscarriage of justice. See Hebshie, 549 F.3d at 44-45 & n.14 (holding that (a) the defendant did not show prejudice from an instruction that "eliminated an element of the crime," because the government provided "strong" evidence of the omitted element and defense counsel failed to contest that evidence; and that (b) even if the defendant had shown prejudice, the omission did not cause a miscarriage of justice, "[b]ecause the evidence was not closely contested and [was] sufficient to support [his] conviction"). Rodríguez-Torres, Sánchez-Mora, and Vigio-Aponte claim that "insofar as" their "conviction[s]" are "based on erroneous elements," that in itself is enough to show prejudice and a miscarriage of justice. But this argument conflicts with settled law. See id. at 44 (explaining that "[t]he mere fact that an erroneous instruction resulted in the omission of an element of the offense is not alone sufficient to demonstrate a prejudicial [e]ffect on the outcome of the trial"); see also Johnson, 520 U.S. at 470 (noting that (a) if an instruction omitting an offense element did not affect the judgment, it "would be the *reversal* of

- 46 -

[such] a conviction" that would seriously affect the fairness, integrity, and public reputation of judicial proceedings, thereby causing a miscarriage of justice; and that (b) "[r]eversal of error, regardless of its effect on the judgment, encourages litigants to abuse the judicial process and bestirs the public to ridicule it" (emphasis added and internal quotation marks omitted)). Rodríguez-Martínez makes no effort to show prejudice.[14] And he wrongly argues that a misinstruction automatically causes a miscarriage of justice. As for Guerrero-Castro, he makes no attempt to show either prejudice or a miscarriage of justice. All of which devastate their plain-error bids. See Rivera-Carrasquillo, 933 F.3d at 49; see also United States v. Gordon, 875 F.3d 26, 30 (1st Cir. 2017) (stressing that "[t]he party asserting that an error was plain must carry the burden of establishing that the claimed error satisfies each element of this standard"); United States v. Ponzo, 853 F.3d 558, 586 (1st Cir. 2017) (deeming an argument waived because defendant made no effort to meet each part of the plain-error test).[15]

---

[14] To the extent Rodríguez-Martínez tries to fix this by mentioning prejudice and miscarriage of justice in his reply brief, his effort comes too late. See, e.g., United States v. Marino, 833 F.3d 1, 6 n.3 (1st Cir. 2016) (stressing that an argument introduced in a reply brief is waived).

[15] Rodríguez-Torres, Sánchez-Mora, and Vigio-Aponte label the instructions generally confusing. But they offer no miscarriage-

We shift then to argument (2), involving the knowledge-instruction claim.  Recall that the judge (among other things) told the jury that the government had to prove that "the defendant knowingly participated in the conspiracy with the intent to accomplish [its] objectives or assist other conspirators in accomplishing [its] objectives," with knowingly "mean[ing] that something was done voluntarily and intentionally, and not because of a mistake, accident or other innocent reason."  We need not — and thus *do not* — decide whether the judge committed an error that is plain here, because even if defendants could show error and plainness (and we do not suggest that they can), they have not shown prejudice or a miscarriage of justice.  Each defendant owned a drug point.  And because "drug-point ownership was a vital component" of the "conspiracy, given that the whole point of the enterprise was to maintain control of as many drug points as possible to earn more money," we easily conclude that "the jury had abundant evidence to find that the [d]efendants were integral parts of the enterprise's activities," see Ramírez-Rivera, 800 F.3d at 20 — evidence that satisfies the "knowledge" element too, see id. at 18 n.11.  So the supposed instructional error could not

_____

of-justice argument — which dashes their hopes for a reversal on that basis.  See, e.g., Ponzo, 853 F.3d at 586.

have changed the outcome. See United States v. O'Brien, 435 F.3d 36, 40 (1st Cir. 2006) (explaining that "it is enough to sustain the conviction that the result would quite likely have been the same" despite the off-target instruction).

Apparently forgetting about Johnson and Hebshie, Rodríguez-Torres, Sánchez-Mora, and Vigio-Aponte try to head off this conclusion by again wrongly asserting that misinstruction necessarily prejudices a defendant. Rodríguez-Torres, Sánchez-Mora, and Guerrero-Castro also call the evidence of their knowingly joining the conspiracy "weak" — an assertion we have already disposed of.

But even if they could show prejudice (which, again, they cannot), they have not shown that their convictions caused a miscarriage of justice. That is so because they rely on the already-rejected argument that a verdict based on an instructional error automatically constitutes a miscarriage of justice.

*Argument (3)*

Given Latorre-Cacho, Rodríguez-Torres, Sánchez-Mora, Vigio-Aponte, and Guerrero-Castro have shown that the instruction about a firearms crime being a RICO predicate is both error and obviously so.[16] But even if we assume (without granting) that they

---

[16] Latorre-Cacho came down years after our defendants' trial. But plain error's "error and plainness" requirements "are judged

- 49 -

can also show prejudice, they still must prove a miscarriage of justice. And unfortunately for them, they have not.

Noting that only two predicates are needed to support a RICO-conspiracy conviction, the government sees no miscarriage of justice. According to the government, "because it was undisputed that the La Rompe conspiracy comprised" many instances of "drug-trafficking and murder, the jury necessarily would have found those predicates." For their part, and as the government also notes, the challenging defendants base their miscarriage-of-justice argument entirely on the false premise that a jury's being "misinstructed as to an element of the offense" necessarily "cast[s] doubt [on] the integrity and fairness of a judicial process." We say "false" because, as we have been at pains to explain, Johnson and Hebshie reject that premise.[17] And by failing

_____

as of the time of appeal." United States v. Torres-Rosario, 658 F.3d 110, 116 (1st Cir. 2011).

   [17] Latorre-Cacho does not help their miscarriage-of-justice theory either. Because the evidence of the proper predicates there — drug trafficking, robbery, and carjacking — was not "overwhelming" (for example, the Latorre-Cacho defendant testified, contesting any ties to the alleged predicate acts), we could "not see how [the miscarriage-of-justice] prong of the plain error standard precludes [him] from demonstrating plain error," especially since prosecutors waived any argument that might have refuted his miscarriage-of-justice theory. See 874 F.3d at 311. Two things distinguish Latorre-Cacho from our case. Here, unlike there, the evidence of the proper predicates — drug selling and murder (discussed in addressing argument (1), which recaps info discussed in addressing the sufficiency claims) — was overwhelming (or at least our defendants make no effort to show a lack of

- 50 -

on the miscarriage-of-justice front, defendants' argument (3)
contentions come to naught.  See, e.g., Ponzo, 853 F.3d at 586.

## Wrap Up

Having reviewed defendants' instructional-error claims
with care, we find that none strike home, because they failed to
satisfy all facets of the plain-error inquiry.

## SENTENCING CLAIMS

### Overview

Rodríguez-Torres and Rodríguez-Martínez attack their
concurrent, within-guidelines sentences as procedurally and
substantively unreasonable.  The pertinent background is as
follows (fyi, given the issues in play, there's no need to get
into all the sentencing math behind their terms).

The judge assigned Rodríguez-Torres an offense level of
43 and a criminal-history category of II, which yielded a
guidelines-sentencing range of life in prison.  But the judge
varied downward, sentencing him to concurrent 405-month terms on
the RICO-conspiracy count, the drug-conspiracy count, and a drive-
by-shooting count.  The judge later assigned Rodríguez-Martínez an
offense level of 31 and a criminal-history category of III, which

_____

overwhelming evidence in pushing their miscarriage-of-justice
plea).  And here, unlike there, prosecutors waived no miscarriage-
of-justice argument.

resulted in a sentencing range of 135-168 months.  And the judge sentenced him to concurrent 168-month terms on the RICO-conspiracy count and the drug-conspiracy count.

On the procedural front, Rodríguez-Torres — repeating arguments that he made and lost below — insists that the judge doubly erred.  He first argues that the judge stumbled by applying a first-degree murder cross-reference specified in USSG § 2D1.1(d)(1) — a provision that jacks up a defendant's penalty range if a person is killed during an offense under circumstances that would constitute murder under federal law.  As he tells it, the cross-reference should not apply because he lacked the *mens rea* ("guilty mind," in nonlegalese) for first-degree murder, since his only involvement in a drive-by shooting (the relevant count of conviction here) was to drive the car whose passengers shot and killed several persons.  He then argues that the judge also blundered by applying a manager/supervisor penalty enhancement under USSG § 3B1.1, because — in his view — no evidence showed that he actually "supervised any other defendant []or that he had sellers, runners, lookouts or any other type of supervision over anyone serving a role in the alleged conspiracy."  As for Rodríguez-Martínez, he contends for the first time that the judge procedurally erred by attributing too much marijuana to him, by wrongly concluding that his drug activities qualified him for a

manager/supervisor penalty enhancement, and by miscalculating his criminal history points.[18]

Responding to the procedural-reasonableness arguments, the government insists that the evidence showed that Rodríguez-Torres aided and abetted the premediated killings. The government then says that role-in-the-offense enhancement had no effect on his offense level, because his offense level was already at 43 — which is the highest offense level allowable under the sentencing guidelines. And the government thinks that Rodríguez-Martínez waived his procedural-reasonableness claim by not objecting to the calculations in the presentencing report.

Rodríguez-Torres and Rodríguez-Martínez then argue in unison that these procedural flubs caused them to get excessive sentences. To which the government replies that because they are merely recycling their failed procedural-reasonableness theories, their substantive-reasonableness claims go nowhere too.

Our reaction is basically the same as the government's.

---

[18] He also says in a single sentence in his brief that the judge "ignored the individualized sentencing required by 18 U.S.C. § 3553(a)." But we deem that suggestion waived for lack of development. See, e.g., United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990).

## Analysis

*Standard of Review*

The standard of review is not without nuance. <u>See</u>, <u>e.g.</u>, <u>United States</u> v. <u>Severino-Pacheco</u>, 911 F.3d 14, 21 (1st Cir. 2018); <u>United States</u> v. <u>Pérez</u>, 819 F.3d 541, 545 (1st Cir. 2016). But for today we need only say that preserved claims of sentencing error trigger abuse-of-discretion review. <u>See</u>, <u>e.g.</u>, <u>Pérez</u>, 819 F.3d at 545.

*Procedural Reasonableness*

Up first is Rodríguez-Torres's *mens rea* attack on the judge's application of the first-degree-murder cross-reference. Federal law defines first-degree murder as "the unlawful killing of a human being with malice aforethought," including "premeditated murder." 18 U.S.C. § 1111(a). Even a brief moment of premeditation suffices. <u>See</u> <u>United States</u> v. <u>Catalán–Román</u>, 585 F.3d 453, 474 (1st Cir. 2009). Federal law also says that a person who aids or abets the commission of a federal crime "is punishable as a principal." 18 U.S.C. § 2. And for current purposes it is enough to say that a person is liable for aiding and abetting if he "'consciously shared the principal's knowledge of the underlying criminal act, and intended to help the principal' accomplish it." <u>United States</u> v. <u>Iwuala</u>, 789 F.3d 1, 12 (1st Cir.

2015) (quoting United States v. Taylor, 54 F.3d 967, 975 (1st Cir. 1995)).

The evidence here easily proves that Rodríguez-Torres aided and abetted the premediated killing of Santos Díaz-Camacho (a La Rompe leader who had "turned" on the organization) and his escorts. Rodríguez-Torres drove one of the cars used to carry out the drive-by killings. And it is reasonable to infer that he knew about the plan to commit the killings and intended by his actions to help make the plan succeed. We say this because the evidence revealed that Rodríguez-Torres arrived at a prearranged meeting with Vázquez-Carrasquillo (La Rompe's top leader, who had ordered Díaz-Camacho's killing) and a group of armed La Rompe enforcers. He then went off with them to "hunt down" Díaz-Camacho. And he helped them at each step, taking some of the posse to Díaz-Camacho's housing complex; waiting with them for hours; tailing Díaz-Camacho and his escorts to a different location; pulling up his car so others could shoot and kill them; and then ditching his (Rodríguez-Torres's) car. Cinching our conclusion is the fact that Rodríguez-Torres drove a person who communicated with a La Rompe leader to coordinate the group's actions and pass along Vázquez-Carrasquillo's orders — so Rodríguez-Torres could have no doubt about the group's murderous intentions.

Very little need be said about the manager/supervisor enhancement, for the simple reason that this enhancement had *no* effect on Rodríguez-Torres's offense level.

As for Rodríguez-Martínez's procedural-reasonableness arguments, we also spend no time on them. And that is because he abandoned them at sentencing, given how his counsel told the judge that he agreed with the relevant calculations as the judge reviewed them. See United States v. Ramírez-Negrón, 751 F.3d 42, 52 (1st Cir. 2014) (finding waiver in a similar situation).

*Substantive Reasonableness*

A sentence flunks the substantive-reasonableness test only if it falls beyond the expansive "universe of reasonable sentencing outcomes." See United States v. Bermúdez-Meléndez, 827 F.3d 160, 167 (1st Cir. 2016); see also United States v. Tanco-Pizarro, 892 F.3d 472, 483 (1st Cir. 2018) (noting that "a sentence is substantively reasonable if the court's reasoning is plausible and the result is defensible"). Rodríguez-Torres and Rodríguez-Martínez believe that the judge's procedural errors led him to impose overly-harsh sentences, amounting to substantive unreasonability. But having shown that their procedural-reasonableness theories lack oomph, we cannot say that the judge acted outside the realm of his broad discretion in handing out the within-guidelines sentences. So their substantive-reasonableness

- 56 -

claims are no-gos.  See, e.g., United States v. Madera-Ortiz, 637 F.3d 26, 30 (1st Cir. 2011).

## Wrap Up

Concluding, as we do, that Rodríguez-Torres's and Rodríguez-Martínez's sentencing challenges lack force, we leave their prison terms undisturbed.

## ENDING

All that is left to say is:  *Affirmed*.